Hamby H. Short v. The State.

No. 4049. Decided April 26, 1916.

Rehearing denied May 17, 1916.

### 1.—Murder—Charge of Court—Self-defense—Manslaughter.

Where, upon trial of murder, the State's evidence made out a case of murder while the defense testimony raised the issue of manslaughter, both of which were submitted by the court's charge, but there was not the slightest testimony to raise the issue of self-defense, there was no error in the court's failure to submit the law of self-defense.

**2.—Same—Evidence—Impeaching Witness—Bill of Exceptions.**

Where the bill of exceptions showed that the defendant excepted to the impeaching testimony against his witness in its entirety, and did not point out the objectionable part thereof, and some of the testimony was clearly admissible, there was no reversible error. Following Huffman v. State, 28 Texas Crim. App.. 174, and other cases.

**3.—Same—Bill of Exceptions—Rule Stated.**

The rule is that if an objection is directed at all of the testimony of the witness, a part of which is admissible and a part, perhaps, inadmissible, specific objections must be made to that part of the testimony which is inadmissible. Following Ortiz v. State, 68 Texas Crim. Rep., 524, and other cases.

**4.—Same—Evidence—Impeaching Witness—Case Stated.**

Where, upon trial of murder, the defendant claimed insulting language and conduct to a female relative, and introduced a witness who testified to such insulting conduct by the deceased, and on cross-examination of this witness it was made to appear that she testified at the inquest held over the body of the deceased, which testimony was reduced to writing and in which she contradicted her testimony upon the trial and testified that she did not remember that she made such a statement before the justice of the peace and the district attorney, there was no error in permitting the State in rebuttal to introduce the testimony of these officials who testified that they took such written statement of said witness; that it was read over to her and she signed the same, and to also permit the district attorney to testify that he explained the proceedings to the witness, etc., the defendant objecting to all of the testimony making no specific objection of such rebuttal testimony which was inadmissible; besides the court instructed the jury not to consider such testimony which was inadmissible, pointing out the same. Davidson, Judge, dissenting.

**5.—Same—Evidence—Insulting Conduct to Female Relative—Conduct of District Attorney.**

Where, upon trial of murder, the defendant claimed insulting conduct by the deceased to a female relative, towit, his third cousin, and the State claimed that defendant himself was criminally intimate with said female relative, there was no error to permit the State to show certain circumstances from which the jury could deduce such relations; besides it appeared from the record that the answer of the witness by which the State attempted to prove such relations was not heard by the jury, and the asking of the question merely does not present reversible error, the court instructing the jury not to consider the question. Distinguishing Bullington v. State, 180 S. W. Rep., 679. Davidson, Judge, dissenting.

Appeal from the District Court of Jones. Tried below before the Honorable John B. Thomas, judge.

Appeal from a conviction for murder; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

W. H. Murchison, J. C. Randell, and E. T. Brooks, for appellant.— On question of self-defense: Lister v. State, 3 Texas Crim. App., 17; Branch's Crim. Law, pp. 42, 43 and 59.

On question of conduct of district attorney: Vick v. State, 159 S. W. Rep., 50, and cases cited in the opinion.

C. C. McDonald, Assistant Attorney General, for the State.—On question of conduct of district attorney in propounding question to witness: Orner v. State, recently decided.

HARPER, JUDGE.—Appellant was convicted of murder and his punishment assessed at confinement in the penitentiary for life.

The first question raised by appellant is, that the court erred in failing to submit the issue of self-defense. We agree with appellant that, where there is evidence raising that issue, it should be fairly and affirmatively submitted to the jury, therefore it is unnecessary to discuss the authorities cited by him; but it is equally well settled that when there is no testimony raising such an issue, it should not be submitted. The State's evidence would make a case of murder, while the defendant's testimony raises the issue that he is only guilty of manslaughter, but in no instance does he testify to any facts that deceased had or was about to attack him. He says that Mrs. Ruth Foster was his third cousin, and on the morning of the homicide she told him that deceased was claiming that he was the father of her baby, and said that no grounds existed for such claim; that deceased had attacked her on the road one time and dragged her from her buggy, but did not accomplish his purpose. He says he told Mrs. Foster he would see deceased and see if he had any explanation to make; that he went to Nugent and had his horse shod, and as he came out of the blacksmith shop he saw A. D. Blackwell, deceased, and asked him why he (Blackwell) had treated Mrs. Foster the way he had, when Blackwell replied, "Damn Mrs. Foster," and he shot him. This was his testimony on direct examination. On cross-examination he said: "I was six or seven steps from Blackwell when I spoke to him. I did not speak in a loud tone of voice. I spoke loud enough for him to hear me. I asked him for an explanation. I says, 'I want an explanation of why you have treated Mrs. Foster the way you have.' That was all I said, and he just sort of frowned up and said, 'Damn Mrs. Foster,' and it just flew over me in an instant and I shot him." It is thus seen that neither in his direct or cross-examination does appellant contend that deceased made any demonstration of any character, while the State's evidence is that appellant walked out of the blacksmith shop and shot deceased without even speaking. It is thus seen that there is not the slightest testimony to raise the issue of self-defense.

Mrs. Ruth Foster testified in behalf of appellant, and testified on this trial that Mrs. Bessie Delap had told her deceased was claiming to be the father of her baby, and that she told appellant about it on the morning of the homicide; that she also told him that some seven months prior to the homicide deceased had met her on the road and made indecent proposals to her, and when she refused to accede to his bequests, he caught hold of her and jerked her out of the buggy, and threw her down in the road, but she screamed and hollered, when he left her, saying, "Well, d—n you go on"; that she told appellant this but a few hours before the homicide. On cross-examination it is made to appear that this witness had testified at the inquest held over the body of the deceased on the day of the killing, and her testimony reduced to writing and signed by her. In this statement she said:

"I did not know that A. D. Blackwell was killed until Mr. Berryhill came to bring me here. H. H. Short told me about three weeks ago that Arthur Blackwell was telling it around that he, Blackwell, was the father of my baby, which was four months old the 7th of this month. Short said Blackwell had told this to him two or three months ago but that he had never said anything about it. Short and myself were at home when he told me this. A. D. Blackwell never had sexual intercourse with me in his life. I never in my life was with him, A. D. Blackwell, without someone else being present. I was in Mr. Blackwell's store in January, 1915, when Bessie Delap was with me. I never bought a thing myself at the time I was in the store. Hamby Short had told me about what Mr. Blackwell had said at this time. Mr. Blackwell had never been to my house only when Sol was there, my husband. . . . Hamby Short and I had talked two or three times before this time about Hamby going to Mr. Blackwell and having the talk straightened up. I proposed to Hamby that he go to straighten the talk up instead of my husband, the first time he talked to me about it. Hamby and I talked about him going to see Blackwell this morning. Hamby Short told me this morning that he was going to go see Mr. Blackwell today and have him, Blackwell, straighten the talk up, or he, Short, would kill him, Blackwell. The last thing Hamby Short said to me this morning when he left my house, was that he was going to see Blackwell and have him take back what he had said, or he was going to kill him. . . . Blackwell never hugged nor kissed me in my life. He never made love to me. He never made proposals of any kind whatever to me that were improper. I was never with him except when someone else was present."

In regard to making this statement she testified: "I don't remember making a statement about this matter to Judge Stinson, which was taken down in writing. I don't remember making a statement to him the day Mr. Blackwell was killed. I did not make a statement in writing before Judge Arnold that I remember of. I don't remember making a statement at Esquire Arnold's residence there in Nugent the day of the killing. I don't remember seeing Judge Stinson or him telling me to be careful what I said. I don't remember him telling me to read the statement over and see if it was what I meant to say. I don't remember him asking me if I would be willing to swear anywhere that that was my testimony in the matter. I don't remember him saying to me that I might be asked to change my testimony. I guess that is my signature (referring to signature to statement), that is my name to it. I didn't do that writing. I don't remember signing my name to that. I don't remember writing that at all. I have no recollection whatever of making a statement to Judge Stinson and Judge Arnold at Judge Arnold's residence the day of the killing. I don't remember anything about Judge Stinson telling me he didn't want me to be scared but wanted me to be careful and be sure and make the statement I wanted to make. I don't remember saying in the statement before Judge Stinson and Judge Arnold that 'Hamby

Short told me about two weeks ago that A. D. Blackwell was telling it around that he, Blackwell, was the father of my baby, which was four months old the 7th of this month.' That is not true. I did not say that Short said Blackwell had told him that two or three months ago and that he had never said anything about it. I did not say in that statement that Short and myself were at home when he told me that. I did not say in that statement, 'I never in my life was with A. D. Blackwell without someone else being present.' If I made that statement I didn't know anything about it. I did not say in a statement before Judge Stinson that I told him about that on Tuesday night, the 9th of February. Hamby did not talk with me about what Blackwell had said. I did not make the statement to Judge Stinson that 'It was two or three days Hamby had been at my house and had talked with me about Mr. Blackwell and I had talked with him about going to Blackwell to have the talk straightened up.' I did not have that talk with Hamby Short. Hamby had never talked about it with me. I didn't make that statement that Hamby and I had talked two or three times before this about Hamby going to Blackwell and have this talk straightened up. If I made that statement I don't remember it. . . . Since I have thought the matter over I do not have any recollection of going down to Nugent the day Mr. Blackwell was killed. I can't remember anything about going to Esquire Arnold's and making that statement. I don't know whether I wrote my name to that statement or not. I can't write my name on that paper for you. I guess I could write it but I couldn't write it so you could read it."

After she had so testified, if the State desired to offer the statement in evidence it became necessary to prove that she had made the statement and signed it on the day of the homicide, and the State in rebuttal called the justice of the peace, Judge F. M. Arnold, who testified that he took the statement of Mrs. Ruth Foster on the day of the homicide; that it was read over to her after it was written, and she signed it. The district attorney, Judge Jas. P. Stinson, was also called, and testified that Mrs. Foster made the statement and signed it before Judge Arnold. In bill No. 4 it is shown he testified: "My name is Jas. P. Stinson. I am district attorney of the Thirty-ninth Judicial District of Texas. I visited Nugent the day Blackwell was killed and assisted in taking the testimony of parties, I think about eleven. I took the testimony of Mrs. Ruth Foster under the following conditions: We went to Nugent that day in response to a telephone call. The sheriff, myself and Mr. Cearley, the county attorney, and Mr. Keifer, the reporter, and I believe Mr. Reeves or Mr. Hudson, but Mr. Register anyway, and we got down there just a little after 12 o'clock and entered immediately into holding the inquest. We had met the defendant at the end of the eleven-mile lane and the sheriff sent him on with Archer, and we began summoning the witnesses and issued a subpoena for Sol Foster and his wife and Mr. Register sent the auto. Mr. Berryhill and Jess Holmes were the drivers. They got

there about 4 o'clock in the afternoon, and quite a number of witnesses had been examined when they got there.. When Mrs. Foster came we were waiting for them; they were both sworn as witnesses in the case and a statement taken from both of them. The statement of Mrs. Ruth Foster I wrote as near as I could in her own language to connect it and make a narrative statement. After I took the statement—before I took it, I explained to her what the proceeding was. and then I took her evidence and she signed it after it was read over. Before she signed it I read it over to her carefully word by word in order that she could not possibly make any claim of misunderstanding and she listened to it carefully. I asked her if that statement was true and she said it was absolutely true and says: 'I will never change it.' I told her I wanted a statement she was going to swear to when the case was called for trial. I says: 'When the defendant's lawyer gets to you he is going to want you to make another statement.' "

The bill shows that the testimony in its entirety was objected and excepted to. The bill does not undertake to point out any specific part of the testimony as objectionable, but the objection is made to all of it. Certainly that portion of Mr. Stinson's testimony in which he testified, "The statement of Mrs. Ruth Foster, I wrote as near as I could in her own language to connect it and make a narrative statement. After I took the statement—before I took it, I explained to her what the proceeding was and then I took her evidence and she signed it after it was read over," was admissible. Mrs. Foster had testified to a wholly different state of facts on the trial of this cause, and it was permissible, under the rules of law, to show that she had made a different statement prior thereto when first questioned in regard to the matter. (Huffman v. State, 28 Texas Crim. App., 174; Levy v. State, 28 Texas Crim. App., 203; Fuller v. State, 30 Texas Crim. App., 559; Campos v. State, 50 Texas Crim. Rep., 288; Gonzales v. State, 35 Texas Crim. Rep., 33; Newman v. State, 70 S. W. Rep., 951; Gallegos v. State, 48 Texas Crim. Rep., 58; Clanton v. State, 13 Texas Crim. App., 139; Gibson v. State, 45 Texas Crim. Rep., 312; Underhill on Crim. Ev., secs. 238 and 239; Wharton's Crim. Ev., sec. 482, and cases cited; Branch's Penal Code, vol. 1, p. 106.) And it is the rule that if an objection is directed at all of the testimony of a witness, a part of which is admissible and a part perhaps inadmissible, specific objection must be made to that part of the testimony which is inadmissible. In the case of Ortiz v. State, 68 Texas Crim. Rep., 524, this court, speaking through Judge Davidson, held: "A great deal of this testimony was clearly legitimate, and some of it may or may not be objectionable owing to the purpose for which it was introduced. The objections are general. A bill of exceptions is too general for consideration if it includes a number of statements, some of which are clearly admissible, and there is nothing in the objection directly pointing out the supposed objectionabe portions of the evidence. (Citing Branch's Crim. Law, sec. 47; Payton v. State, 35 Texas Crim. Rep., 508; Tubb v. State, 55 Texas Crim. Rep., 606; Cabral v. State, 57 Texas Crim. Rep., 304.)

Where evidence is introduced over objection, some of which is admissible and some of which is on doubtful grounds or which might be objectionable, it is the duty of the objector to specify in the bill the particular portion to which objection is urged." In this case, as in that case, the objection as shown by the bill was to all the testimony, and the ground, as in that case, was that it was introduced "for the purpose of prejudicing the jury and inflaming them against the defendant, and improperly reflecting on the credibility of the witness Mrs. Ruth Foster." In Branch's Ann. Penal Code, sec. 211, vol. 1, p. 135, the authorities are collated, and the rule is stated to be: "A bill of exception is too general to be considered if it includes a number of statements, some of which are admissible, and there is nothing in the objections to directly challenge or single out the supposed objectionable evidence." However, in the bill it is shown that the court, without objection further than objection to all the witness' testimony, "instructed the jury not to consider said evidence of the district attorney relative to his reasons for careful inquiry and his said statement with reference to what the defendant's attorney might do, and to stay within the bounds of relevant testimony while upon the stand." Under such circumstances the bill presents no error.

The only other bill of exceptions in the record relates to a question propounded to the witness Mrs. Bessie Delap, who was called as a witness by the State in rebuttal. It will be seen from the above that appellant's contention was that deceased had made improper remarks concerning and to his third cousin, Mrs. Ruth Foster. The State's contention was that appellant himself was criminally intimate with Mrs. Foster, and called Mrs. Delap, who had been an inmate of Mrs. Foster's home, to prove certain circumstances from which a jury could deduce such relations between appellant and Mrs. Foster. This testimony was legitimate and proper as tending to show the interest and friendly relations of Mrs. Foster to appellant, she being his most important witness, tending to raise the issue of manslaughter. And as said by this court in Redman v. State, 52 Texas Crim. Rep., 596, if appellant's third cousin was unchaste, and he knew that to be true, by having had sexual intercourse with her himself, this fact was admissible, if it could be proven by either positive or circumstantial testimony, as he was claiming that slanderous remarks to and concerning this relative so inflamed his mind as to reduce the offense to manslaughter. By the bill, however, it is shown that after the court had warned the district attorney not to ask the question, at appellant's instance, the assistant counsel for the prosecution asked the witness Mrs. Delap, "If the defendant, Hamby Short, ever got in bed with you?" The question was at once objected to, and objection sustained. It is rendered questionable by the record whether or not the witness answered the question, she saying she did say "yes," but the evidence of the jurors placed on the stand, when the motion for a new trial was heard, shows they heard the question but did not hear the answer, and the court in approving the bill says no answer was made to the question, or if

one was made it was in too low a tone to be heard. As the answer was not heard by the jury, the only question presented, does the asking of the question present such error as to call for a reversal of the case? Appellant relies on the recent case of Bullington v. State, 78 Texas Crim. Rep., 187, 180 S. W. Rep., 681, and we would again emphasize that no question should be propounded which the prosecutors know to be inadmissible, for if it is done and the circumstances are such that the person on trial may have been injured thereby, the case should be and will be reversed. But this record is wholly different from that in the Bullington case, for in this case it is made manifest by the bill that the court promptly sustained an objection to the question, and at once instructed the jury not to consider the question, and permitted no answer to be heard by the jurors, and the Bullington case, supra, was not reversed on that question alone, but there were other questions in the case which necessitated a reversal. In this case it is made to appear that had Mrs. Delap been permitted to answer the question, she would not only have testified that appellant did get in the bed one night while she was residing at the home of Mrs. Ruth Foster, but that she complained to Mrs. Ruth Foster about appellant doing so, and Mrs. Foster, appellant's principal witness, failed and refused to take any steps to protect her, and failed and refused to remonstrate with appellant because of this conduct. The relation existing between Mrs. Foster and appellant was a seriously contested issue in the case, and we are not prepared to hold that such testimony would not have been admissible on this issue. If a chaste woman is staying at the home of another pure and chaste woman, and a man, even her third cousin, should seek to outrage the visitor in her home, certainly if she made no remonstrance and permitted this man to continue to visit at her home both when her husband was present and absent, and spend the nights there, it would have some bearing on the relationship existing between the two, when there is other evidence introduced tending to show improper relations. At least, taking into consideration the action of the court, the bill presents no reversible error.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, Judge.—I can not agree to this affirmance.

[Rehearing denied May 17, 1916.—Reporter.]

### July 3, 1916.

DAVIDSON, Judge (dissenting).—In disagreeing with my brethren about the affirmance of the judgment and overruling of the motion for rehearing it may be of service to make a statement of some of the reasons. The question or doctrine of "harmless error" does not enter into the disposition of this case, because defendant received the life sentence when there was ample testimony to authorize a conviction

of the lower offense of manslaughter. The doctrine of "harmless error" and lower punishment are not discussed by the majority opinion. The jury took the harshest view that could have been taken of the testimony. "Harmless error" is discussed as a question where the punishment is the minimum it seems.

I do not believe that the majority opinion deals with the bill of exceptions in regard to the district attorney's testimony as it should have done legally. The whole bill is predicated upon the fact and the objection announced in the bill was to the statements of the district attorney laying a predicate to impeach the witness Mrs. Foster. This was all before the jury and much of it was very damaging and can not be held as properly laying the predicate. The district attorney was permitted to state all his acts and conduct not only of his relations to the witness Mrs. Foster, after seeing her and hearing her testify before the court of inquiry or magistrate, but he gave a detailed account of his trips and other matters that had no connection with Mrs. Foster or her testimony, and what he discovered as well as statements reflecting upon her and the attorneys who might be subsequently employed, indicating they were going to induce her to commit perjury by making an entirely different statement from what she made to him. This was the predicate offered by the State, and objection was urged to it. It was all before the jury, and under the guise of laying a predicate to impeach Mrs. Foster the district attorney was permitted to put in the record and before the jury quite a lot of things that should not have been even in the predicate. If Mrs. Foster made different statements to him to what she testified on the trial, the predicate could have been laid and evidence offered to sustain it, but the predicate must be so laid so to justify a legal and proper contradiction or impeachment of the witness. I think, therefore, my brethren misunderstood this bill of exceptions and the purport of the objection stated by appellant. It was treated from the standpoint of evidence introduced before the jury and not as a predicate. It is a safe rule, at least usually so, that where a bill of exceptions recites testimony some of which is admissible and some not, the inadmissible testimony should be pointed out in the bill, but in my judgment this bill was sufficient to present the matter and show error as indicated in the bill. The district attorney claiming to lay a predicate to impeach got before the jury those damaging facts from a standpoint of original testimony. I do not care to follow this further.

The other question that I desire to mention is the testimony of the witness Mrs. Delap. Substantially, Mrs. Delap was permitted to state that appellant went to her bed and undertook to crawl into it one night while she was residing at the home of Mrs. Foster, and that she complained to Mrs. Foster about appellant's conduct, etc. Mrs. Foster was a cousin of appellant, about whom much appears in the record, and on account of the conduct of the deceased towards Mrs. Foster appellant killed him. Of course, within the statute Mrs. Foster was a female relative. The State's theory was that appellant had been in-

timate with Mrs. Foster, and, therefore, he was cut off from the issue of manslaughter under the Redmond case, cited by the majority opinion upon the idea that if appellant was intimate with Mrs. Foster, he could not become excited under the law of manslaughter for killing the deceased on account of slandering her reputation for virtue. This was a seriously disputed issue. The Redmond case is not even in point. Whether that be true or not I do not now purpose to discuss. If that proposition is correct, as urged by the majority opinion, then I can not understand why the fact that appellant undertook to have sexual intercourse with Mrs. Delap should have been used against him for killing a man whom he says slandered his female relative, Mrs. Foster. The issue was sharply raised in the record and most strenuously denied by appellant that he and Mrs. Foster had ever been guilty of any immoral conduct. What the evidence in regard to an insult by appellant to Mrs. Delap would have to do with the issue of manslaughter on account of insulting conduct of deceased towards Mrs. Foster, as it bore upon the defendant, is hardly explainable upon any legal line. He had not placed his reputation in issue as to being a virtuous man or otherwise. Mrs. Delap had nothing to do with any amours between Mrs. Foster and appellant, if any such occurred, but this testimony was introduced against appellant, and it is of the most serious and damaging character. The majority seemed to justify the introduction of this testimony and its effect upon the case by stating that Mrs. Delap was a guest, or at least was in the house owned by Foster and Mrs. Foster, and, therefore, Mrs. Foster was winking at the amours or attempted amours of appellant with Mrs. Delap. The State as well as the majority of this court seem to overlook one fact of human nature, that if Mrs. Foster and appellant were carrying on amours through illicit love, that Mrs. Delap would hardly be taken under the protection of Mrs. Foster by Mrs. Foster. Such a statement by the majority opinion is hardly to be verified on the theory of woman nature. But in any event, the testimony of Mrs. Delap that appellant tried to crawl in bed with her was not legitimate testimony to show that appellant either was intimate with Mrs. Foster or that he killed the deceased because of the deceased's intimate relations with Mrs. Foster. This testimony should not have gone to the jury. Appellant was contending for the issue of manslaughter and innocent relations with his relative, Mrs. Foster. She was denying strenuously that there had been any illicit relations between them, and when she informed appellant of the conduct and statements of the deceased, the defendant killed him. This, as to Mrs. Delap's testimony, had a tendency to do so, if it did not completely cut him off from the issue of manslaughter. Any illicit relations with Mrs. Delap could not even tend to affect his relations with Mrs. Foster so as to deprive him of the issue of manslaughter. It did, however, do so, and this to the result of life sentence for murder. It, therefore, necessarily affected the case seriously against appellant. The judgment should have been reversed. I do not care to further discuss the matter.

This judgment ought to have been reversed and appellant awarded another trial.