James Darryl TAYLOR, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 65286, 65287.

Court of Criminal Appeals of Texas, En Banc.

June 22, 1983.

Kenneth M. Stillman, Dallas, for appellant.

Henry Wade, Dist. Atty., Stanley Keeton, Martin Lenoir and Ronald Poole, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

These are appeals from convictions for murder and attempt to murder obtained in a single jury trial; life sentences were assessed in each cause.

### I.

The sufficiency of the evidence to support the jury's verdict in the murder cause is challenged.

On May 16, 1979, Gregory Taylor (The State's main witness in these causes and the victim of the attempt) was walking down the street when appellant and Marilyn Garrett[1] stopped to pick him up. According to Taylor—whose street name was "Rat" because "I am a thief"—he bought some gin and some Schlitz beer from a bootlegger. The three then rode around in appellant's car, drinking and shooting preludin through the afternoon. Later, after Rat[2] took a bath at his mother's house, he was picked up about 11:00 p.m. by appellant and Marilyn again. Riding around, looking for more drugs, the three ultimately headed for a club in South Dallas called the Sunset Strip.

On arrival, Marilyn, who had been driving, parked the car and motioned a man she called "June Bug"[3] over. She told him they were looking for some "preludes" and asked if he knew about any. June Bug indicated he did, and went inside to find his cousin, Eddy Lee Finch, also known as "Pun'kin," the soon to be deceased. Pun'kin came to the car and told the group he only had two preludin left, but he thought he knew where some more were. He went back inside and returned with a very large man who was only identified as "Big Lawrence." Big Lawrence told the group in the car that he had about 30 more preludin at his house and would get them if they would give him a ride there.

Big Lawrence and Pun'kin climbed into the back seat of appellant's two door Pontiac beside Rat who was behind appellant. Marilyn followed Lawrence's directions to an apartment on Loomis. There, Big Lawrence exited the car and went inside. After about five minutes, Lawrence came back out and was headed toward the driver's side of the car when, according to Rat, appellant pulled a pistol and pointed it at "everybody in the back seat." Rat testified, "I tried to push the back seat out and the gun went off." He sustained a gunshot wound to the chest.[4] He lost consciousness. When he woke up, he jumped out of the car and landed on the pavement. After lying there momentarily, he got up and ran "around the corner and down about two or three streets," then ran to a house and passed out. According to Rat, he was missing over $100.00 in cash and a ring after the incident.

Dallas Police Officer R.W. Everett testified he and his partner received a radio dispatch at about 2:00 a.m. on May 17, 1979 about a shooting. On the 1400 block of

---

1. By the time of trial, Marilyn Garrett and appellant were married, though the status of their relationship at the time of the offense is unclear from the admissible evidence.

2. To avoid confusing Gregory Taylor with the appellant, we will refer to the former by his street name, "Rat;" for consistency, we shall call all characters by their street names after initial introductions.

3. June Bug's name is Berry Lee Ford, Jr.

4. Dr. Richard Thirlby testified that emergency surgery was performed on "Rat" to repair an artery; the following night, the patient began losing massive amounts of air, so another emergency procedure was conducted in which a hole in his trachea was repaired.

Maryland Road,[5] Everett and his partner found Rat who had been shot once, his head swollen to twice its normal size. After putting Rat into an ambulance, the officers proceeded to the apartment on Loomis where a dispatch about a shooting had gone out right before they were sent to Maryland Road. On arrival, they found a body at the top of the stairs at the apartment complex. Eddie Lee Finch (Pun'kin) had already been pronounced dead. Appellant's Pontiac was found with the headlights on and "the front door ... open" parked northbound in the southbound lane of the 3700 block of South Lamar—about 30 yards from the body of the deceased. According to Everett, about three different people "told [him] they had heard the gunshots and looked out and saw three people running from a vehicle that was parked in the 3700 block of South Lamar ...,"[6] a woman and two men. The car was identified as appellant's.

Ballistics tests determined that Rat and Pun'kin were both shot with the same .38 caliber pistol. No blood was found in appellant's car. Marilyn's fingerprint was found on a Schlitz beer can recovered from the left front floorboard of the car and Rat's fingerprints were lifted from a hard hat which was found between the back seat and the back windshield.

Thomas F. Gilchrist, M.D., Dallas County Assistant Medical Examiner, testified he performed an autopsy on the deceased who had sustained two gunshot wounds at virtually point blank range: from two to five inches.[7] The fatal bullet entered the left side of his back just above the waist, and traveled up, forward, and to the right, lodging in the chest muscle; this bullet passed through the left kidney, the inferior vena cava, the liver at the juncture of the left and right lobes, and the right lung before exiting the chest cavity and lodging in the right chest muscle.

The other bullet entered the front left chest muscle at about the armpit and exited about 4 cm. above and to the right of the entrance wound.

Dr. Gilchrist was not asked how mobile the victim might be or how long he might live after sustaining such injuries, though he did testify such wounds would not cause a lot of external bleeding. Like Rat, the deceased had no money on his person when found by the police, though witnesses testified he earlier had some money in his sock.

On direct examination, the prosecutor set up a hypothetical question in which five individuals were in a two door car and the deceased attempted to get out of the back seat on the passenger side; Gilchrist testified it would be consistent with the wounds sustained that he was shot by a person sitting in the front seat in the passenger side [8] at close range. He also testified that the relationship between the two entrance wounds—that "they go through the body at the same angle"—would mean that it is a high likelihood that the victim was in more or less the same position as the shooter.

Gilchrist further opined that the soot on the wounds indicated the deceased was not running at the time he was shot.

On crossexamination, defense counsel suggested a hypothet in which the deceased was shot by "a person in the left front seat, behind the steering wheel,"[9] as he "tried to get out the right side." Gilchrist conceded that any of the other persons in the car could have done the shooting, though some were more likely than others.

■ While the evidence establishing appellant's guilt of murdering the deceased is tenuous, and large unexplained gaps exist

---

5. Everett testified this location was about one city block from the apartment on Loomis.

6. No information about the number of shots or direction of the fleeing individuals is contained in the record.

7. The medical testimony regarding Rat was that he too was shot at this range.

8. The person sitting in the front passenger seat, according to all testimony, was appellant.

9. All the uncontroverted evidence established Marilyn Garrett was in the driver's seat of the car.

in the sequence of events, we believe a rational trier of fact could have found appellant intentionally caused Eddy Lee Finch's death beyond a reasonable doubt under the charge of the Court. *Griffin v. State,* 614 S.W.2d 155 (Tex.Cr.App.1981); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Most compelling is the ballistics evidence that the deceased and Rat were shot with the same weapon; that weapon was placed in the hand of appellant by Rat's testimony. Clearly, Rat did not have the .38 revolver; Big Lawrence was not near the car at the time of the fray and the evidence indicates it was a friend of the deceased who, like the deceased, was unacquainted with the others in the car. Through a process of elimination only appellant and Marilyn Garrett remain as possible perpetrators of the murder. Under the trial court's charge, the jury was authorized to convict appellant if they found he intended to promote or assist in committing the murder and solicited, encouraged, directed, aided or attempted to aid another in its commission.

Taken as a whole, the evidence would not support any reasonable conclusion other than that appellant, either alone or as a party, committed the offense in question; accordingly, the ground of error attacking the sufficiency of the evidence to support the murder conviction is overruled.

## II.

In both causes appellant complains of the trial court's permitting his coindictee's extrajudicial statement to be placed before the jury.

Placing the issue in context, the record reflects that during the State's case in chief, the prosecution was twice permitted over objection to have Marilyn Garrett Taylor brought into the courtroom and identified by witnesses.[10] After the State rested and appellant adduced testimony that Rat had been known to carry a 9 mm automatic pistol,[11] the defense called Marilyn Garrett Taylor to the stand. Asked to state her name, the witness replied "Marilyn Garrett." Then:

"Q: Marilyn, have you consulted with your lawyer here today?

A: Yes.

Q: Do you desire to testify here today? Do you want to testify here today?

A: No.

[Defense counsel]: We pass the witness."

At the prosecutor's request, the jury was removed from the courtroom. He told the court:

"It is my objection that since he has called her in the presence of the jury, that I can cross-examine. He could have done this outside the presence of the jury. It is most obviously bad faith to call her to the stand knowing that I am not going to be allowed to cross-examine her. To imply that we could come give some testimony that would be exculpatory to the State [sic (?)], that is the impression that he made, and I think that I should have the opportunity to cross-examine. * * * [Defense counsel]: I wouldn't even answer a question about bad faith, Your Honor, but *this witness has every right not to testify since she is a co-defendant* in the case. *My client has every right to call her to the stand if he so desires*[12] but she also has a right as a co-defendant not to testify, *and I think she so stated.*

THE COURT: * * * Now I recognize the right of the defendant to call a witness and I recognize the rights of the defend-

10. Appellant both times objected on the ground that by "bringing this man's wife into the courtroom ... the State of Texas is trying to do something indirectly that they cannot do directly."

11. When the police searched appellant's car after the shootings, they recovered a 9 mm automatic pistol from the backseat, the presence of which Rat could not explain.

12. This, of course, is highly questionable under the circumstances. See *Victoria v. State,* 522 S.W.2d 919 (Tex.Cr.App.1975); *Rodriguez v. State,* 513 S.W.2d 594 (Tex.Cr.App.1974). (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

ant's attorney to ask the question that was asked; however, I will allow the State to ask a question to cross-examine her. However, *I will note that there has been no privilege invoked at this hearing at this time, so the Court will reserve any right to rule on the privilege if it appears and when it was invoked.*

[Prosecutor]: I think we ought to do it in the motion. If he is going to invoke privilege, he has invaded the province of the Court.

THE COURT: The Court has noted no privilege being invoked at this time. *The question I remember him asking is if she didn't desire to testify.* Now ... I will allow the State to proceed with cross-examination.

However, [addressing the witness's attorney], if you have any motion, Counsel, you need to invoke whatever privilege you desire *at the proper time.*

[Witness's attorney]: Judge, as I stated here in open court in front of the jury, this is my first opportunity to talk to this woman. I talked to her for about five minutes back there ... and at that time her attorney, Mr. Holland called on the phone, and ... *he advised me to advise her not to testify, as she is a co-defendant.*

THE COURT: Counsel, if you desire, I will [sic] you an opportunity to brush up on the procedure. I realize that you were put in the middle in this situation, *but if your client is desiring to invoke the privilege, I am going to require you to do it in the proper manner, since this has been brought in Court.*

\*　　\*　　\*　　\*　　\*　　\*

[Witness's attorney]: \* \* \* I wasn't quite clear on the relationship of the two parties insofar as the privilege is concerned. *I assume you are talking about the husband and wife privilege, and the only thing that I knew for sure was that they were co-defendants in this case.* So if you will give me a few minutes [to review the law] so that I may do that."

After a ten minute recess, the witness's attorney stated he had consulted with his client and was ready to proceed. When the jury was returned to the courtroom, the following occurred:

By [Prosecutor]:

"Q: Mrs. Garrett, do you recall on August the 6th of 1979, signing a voluntary statement for an investigator named G.R. Robinson, stating that *your husband, James Taylor here shot Pun'kin?*

A: I refuse to answer on the grounds that it may incriminate me.

Q: Do you recall signing a statement saying that *your husband, James Taylor, shot Rat?*

A: I refuse to answer on the grounds that it may tend to inciminate [sic] me.

Q: Do you recall in that statement stating that *your husband robbed Big Lawrence of the Preludin?*

A: I refuse to answer on the grounds that it might tend to incriminate me.

[Defense counsel]: I object to this line of questioning at this time.

THE COURT: I will overrule the objection.

Q [By Prosecutor]: Do you recall telling the investigator, G.R. Robinson, that you were driving the car?

A: I refuse to answer on the grounds that it might incriminate me."

This type of questioning continued until the prosecutor had gotten before the jury the facts that the witness had said appellant was "in the front seat with [her]," that he "had a big revolver," had "pointed a pistol at the guy with the Preludin and took them out of his hand," that she and he "ran after the car died," that appellant "talked to Eddy Finch out in front of the Sunset Strip on Logan," that he was "going to rob a dope peddler," and that she, appellant, "Pun'kin, Rat and the other big dude went over to the apartment on Loomis to get some Preludes."

On redirect, defense counsel elicited from the witness that she could not read or write and that she was charged with the same offenses as her husband. She invoked the Fifth Amendment when defense counsel asked her, "so if you signed a statement,

you wouldn't know what you were signing, would you?," and, "Do you remember signing a statement before a police officer?"

On recross, the prosecutor asked only, "Do you recall Investigator Robinson reading a statement to you prior to your signing?," to which the witness refused to respond on the ground that it might incriminate her.

Both sides rested. The entire extrajudicial statement was admitted for the record only at the request of defense counsel.[13]

The trial judge instructed the jury, apparently *sua sponte:*

" . . . [Y]our verdict must be based solely on the testimony of the witnesses who appeared and testified in open court. You cannot consider any question pro-

pounded by the prosecution or the defense which was not answered by such witness. *Specifically, you cannot consider as evidence any facts asserted in the questions propounded by the prosecutor to the witness Marilyn Garrett Taylor.*" [14]

Appellant now contends, as we understand it, that once it became clear from the State's crossexamination that the witness would invoke her privilege against selfincrimination, it was error for the trial court to permit the prosecutor to continue over his objection;[15] that even if it can be argued the defense "opened the door," the State's response was patently improper resulting in the jury's contamination with "facts" not admitted or admissible from any other source and, perforce, manifest preju-

---

13. The content of that statement reads:

"One day in May, I was moving out of my apartment on Peak Street. Rat, (Gregory Lynn Taylor) and James Darryl Taylor were helping me move. We were in James' car. It is a green Pontiac. Later in the day around dark, Rat told ts [sic] that he wanted to score some preludes. I knew that he was going to try to rob a dope dealer because he didn't have any money and was carrying a pistol. He had a big automatic pistol. James had a big revolver. Rat had said earlier that he and his brother, Darryl Wayne Taylor, had been hi-jackin dope dealers and that was how they had been getting high. We drove down on Oakland Street and stopped at the Sunset Strip on Logan St. James got out of the car and talked to a guy I know as 'punkin' (Eddie Lee Finch). He asked Punkin if he had any preludes. Punkin told him he didn't have any but he knew where he could get some. Punkin went inside the Strip and got another dide [sic] and came back and they both got in the car. I don't know eho [sic] the other guy was but he was about 6'1" and weighed about 200 pounds. Before they got in the car James told Rat that he thought Punkin and the other guy was going to try and rob them. After they got in, the other guy told me which way to go and I drove to some apartments on Loomis. When we got there the men all got out and went into the apartments. They were gone about five minutes and came back to the car. James told me to scoot over so he could drive. Punkin and Rat got in the back seat. The other gy [sic] said he was going to stay there and didn't get in. I glanced around to the back seat and Punkin and Ray [sic] was scuffling. *I heard Rat say, 'shoot him he's going to shoot me, I can't get my gun out.' James turned around and fired*

several times. James then turned to the other guy, pointed the pistol at him and took the preludes out of his hand. Punkin climbed out the window and James pulled out of the parking lot. The car died and James told me to run. James and I ran and left Rat a little ways from the car *because James had shot him by mistake* and he couldn't run."

14. However, during the prosecutor's final argument, the following occurred which forms the basis of grounds of error in both causes:

"What else do we know about Marilyn? *The only question that Marilyn answered is* can you read and write. The only one that she chose to answer was no, and once again the implication they are trying to leave with you there is this Dallas police officer, Investigator Robinson, *would go out and take a voluntary statement from someone* —just shove a piece of paper in front of her and say here, you sign this.

[Defense counsel]: Your Honor, I will object to that. There is nothing in evidence concerning any written statement. *There is nothing in evidence about a written statement from Marilyn Garrett,* and I will object to it.

THE COURT: *I will overrule the objection.*

[Prosecutor]: Once again, *you may consider what I just said.* Is a Dallas policeman just going to shove a blank statement in there without reading it to her? I believe she can read and write. I believe she lied to you when she told you that."

15. Appellant does not contend the trial court erred by forcing the witness to invoke the privilege before the jury when it had been made known outside the jury's presence that she would do so.

dice; and finally, that appellant was denied the right of crossexamination because the prosecutor who interjected the content of the statement was not a witness subject to crossexamination, and the witness who ostensibly gave the hearsay statement invoked her Fifth Amendment privilege.

The State retorts that "any error" was waived because appellant's objection was neither specific nor timely; that if not waived, any error is not reversible because appellant's action in calling the witness and eliciting her response that she did not wish to testify "was prejudicial to the State" and appellant should not benefit from error invited by his own prejudicial action; and finally, that if interjection of the content of the coindictee witness's statement was error, it was cured by the trial court's instruction to disregard it, and if not cured, the error was harmless beyond a reasonable doubt because without it, the State's case was not less persuasive.

## HARMLESS ERROR

■   Taking the State's contentions in reverse order we first observe that there is no way seriously to argue that the selections of the content of Marilyn Garrett Taylor's statement which were offered for the jury's consideration, was harmless.

No one saw appellant "shoot Pun'kin." No testimony explained the 2½ hour lapse between the time the group left the Sunset Strip at 11:30 p.m. and the time witnesses heard an undetermined number of "shots" at approximately 2:00 a.m. in the 3700 block of Loomis. No testimony explained any of the gaps in the State's case on which an impartial jury could have based a reasonable doubt that appellant "shot Pun'kin." Of course, with the prosecutor's assertion of the fact that appellant's wife told an investigator he "shot Pun'kin," any reasonable doubt harbored by a juror was no doubt dispelled.

As stated earlier, Rat testified on direct only that he was shot when "the gun went off" after he "tried to push the back seat out." On crossexamination this matter was pursued a bit more:

"Q:   Now you say that you shoved the seat against [appellant], is that what you are saying?

A:   I was saying that I was pushing the back of the seat trying to get out of the car. The gun went off and hit me *too.*

Q:   Do you know whether or not James was aiming at you?

A:   He could have—yeah, it hit me.

Q:   You don't know whether or not he was shooting at you or not?

A:   If he had been shooting at Pun'kin, he would have pointed it the other way."

Appellant was accused of "knowingly and intentionally shooting" Gregory Taylor with "the specific intent to commit the offense of murder."

Needless to say, once the jury heard that an eyewitness to the fray told an investigator appellant "shot Rat," the State's case on the attempt charge was secure.

Moreover, in supplying the jury with these facts that no admissible evidence could provide, the prosecutor did not even give a complete, much less fair rendition of the witness' statement which arguably exonerated appellant of all guilt: according to Marilyn's statement appellant "shot Pun'kin," but in defense of Rat, and he "shot Rat" by mistake. [See n. 13, *ante,* for complete content of statement.]

The suggestion that introduction of these facts supplied by the prosecutor was harmless is untenable. Neither was it possible to erase this critical "evidence" from the jury's collective consciousness by an instruction to disregard it—and particularly when the prosecutor, in violation of that very written instruction, argued in effect that the statement was not only made by Marilyn, but was made knowingly and intelligently by her. [See n. 14, *ante.*]

## WAIVER

The only question left before turning to the merits, is whether appellant's counsel waived the error by inviting it, failing to object to it timely or on specific grounds.

Appellant avoids complaint of the State's forcing the witness to claim the privilege against selfincrimination in the jury's presence, no doubt because it is manifest that his conduct in calling her and eliciting her lack of "desire" to testify invited the State's response. In fact, it appears from the record that defense counsel fully *expected* the State to elicit the privilege from the witness and had no intention of objecting thereto. Clearly, appellant waived any objection to the witness' invocation of the privilege both by inviting it and failing to timely object.

But in this Court, appellant complains—not of the witness' *answer* (which requires an objection *before* it is given)— but of the prosecutor's *questions.* The increasing prejudicial impact and the determination of the prosecutor to continue in that vein was only discernable after a number of the questions had been posited; thus, after the third one, counsel objected "to this *line of questioning.*"

We hold this objection was adequate to preserve the error under the circumstances presented, *Zillender v. State,* 557 S.W.2d 515 (Tex.Cr.App.1977), and we believe this conclusion is fortified by the fact that the trial court overruled it.

Moreover, we cannot agree that appellant's conduct in calling the witness as he did "invited" the State to thrust patently inadmissible, obviously harmful hearsay bearing on material issues into this trial. It is true the State had a right to crossexamine the witness and impeach her with competent evidence. See *Mitchell v. State,* 517 S.W.2d 282 (Tex.Cr.App.1975). But that is not what the record reflects. The witness

was not being asked questions which would necessarily incriminate *her,* yet the State never asked the trial court to direct her to answer. The obvious reason is that forcing the witness to answer would have violated Article 38.11, V.A.C.C.P.[16] and insured reversal whether appellant objected or not. See *Johnigan v. State,* 482 S.W.2d 209 (Tex. Cr.App.1972); *Carabajal v. State,* 477 S.W.2d 640 (Tex.Cr.App.1972).[17]

## THE MERITS

In sum, the State neither expected the witness to answer nor wanted her to answer; thus, the sole intent was to get before the jury parts of her extrajudicial statement which was absolutely inadmissible for all purposes.[18]

Under similar circumstances, the Court has observed:

" . . . [N]o question should be propounded which the prosecutors know to be inadmissible, for if it is done, and the circumstances are such that the person on trial may have been injured thereby, the case should and will be reversed. * * * If it was sought to get before the jury the contents of the written statement without introducing it in evidence, same was improper ... * * * ... [P]rosecuting attorneys are officers of the State, whose duty it is to see that justice is done, and they should never attempt to get before the jury evidence they know to be inadmissible."

*Lackey v. State,* 190 S.W.2d 364, 365 (Tex. Cr.App.1945) quoting *Short v. State,* 79 Tex.Cr.R. 426, 187 S.W. 955, 958 (Tex.Cr. App.1916) and *Brown v. State,* 269 S.W. 1051, 1052 (Tex.Cr.App.1925).

---

16. Article 38.11, supra, provides in relevant part:

"* * * The husband and wife may, in all criminal actions, be witnesses for each other but ... *they shall in no case testify against each other* in a criminal prosecution. * * * "

17. The prosecutor's understanding of this is demonstrated by another argument outside the record:

"Another thing we know, after this event they got married. Under the laws of the State of Texas, the State cannot call a hus-

band's wife to testify against him. We could have dismissed the murder charge against her, and we still couldn't have called her to testify. Now does that just happen to be mere coincidence that they got married right after *this murder was committed?*"

An objection to this argument was sustained and the jury was instructed to disregard it.

18. See n. 16, *ante,* and *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

The most similar case we have found to the instant one is *Washburn v. State,* 299 S.W.2d 706 (Tex.Cr.App.1956). There, the State called the defendant's coindictee to the stand; after stating his name, the witness invoked his Fifth Amendment privilege, but the State continued to interrogate him, eliciting his refusal to ·testify upon each question. Defense counsel objected to the State's asking additional questions which were placing matters before the jury which could not be shown directly. The objection was overruled. Questions propounded pointed to and inquired about the witness' association and participation with the defendant in making plans and preparations to commit a murder. None of the questions were answered. The conviction was reversed.

In the instant case, the State contends that *Washburn,* supra, is distinguishable because in that case the *State* initially called the coindictee witness. It is true that this is a distinction, but it is not a dispositive one in the case before us.

For while a basis for reversal in *Washburn,* supra, was the State's calling the witness and eliciting his invocation of the privilege,[19] the Court considered it a separate reversible error for the State to continue interrogating the witness in the manner it did:

> "By these factladen questions the State was permitted to plant in the jury's mind full details as to how they claimed this crime was committed, and yet the only substantive evidence which they were producing was the answer of the witness that he refused to answer on the ground that his answers might tend to incriminate him, which of course was no evidence at all.

> \*    \*    \*    \*    \*    \*

Further, the nature of the matters embodied in the questions propounded to the witness ... conveyed to the jury *in the nature of testimony* the information and knowledge apparently possessed by him of the killing. \* \* \* Although the State claims that the witness ... was properly called to testify, yet at no time did it move the court to direct or compel him to answer any of the questions. The first question propounded which the witness declined to answer authorized such motion. The other questions complained of added nothing but more prejudice against the appellant. The court's withdrawal of the questions from the consideration of the jury could not have been effective.... [Emphasis original]"
299 S.W.2d at 707–709.

Rejecting the State's motion for rehearing in *Washburn,* supra, the Court concluded:

> "When the showing was properly made that [the witness] could not be compelled to testify ... because of his claim of self-incrimination, *the State* —under the authorities cited in our original opinion— *should not have endeavored, by further questioning of the witness, to get before the jury the facts, circumstances, or conditions which it could not prove by the witness himself.*

> The fact that the trial court, after the questions had been propounded and the injury done, withdrew the questions from the jury's consideration tends strongly to indicate that the questioning of the witness was wrong in the first instance."
299 S.W.2d at 709–710.

As previously stated, the State had every right to conduct *proper* crossexamination of Marilyn Garrett Taylor, and even elicit her invocation of the privilege under the circumstances;[20] the State, however, was *not*

---

**19.** We have already stated appellant invited, and perforce waived, this error in his own trial.

**20.** Since the witness could testify *for* appellant under Article 38.11, supra, and as a coindictee, the State had no reason to believe she would do otherwise when called to the stand by the defense. Accordingly, since defense counsel gave

no indication outside the jury's presence that the witness would refuse to testify (as is required by law) the State had no opportunity to object or prevent the witness from taking the stand. Thus, since she was there, the State was entitled to crossexamine her at defense counsel's invitation.

entitled to have the witness invoke the Fifth Amendment *repeatedly* and, knowing she would do so, seize upon her refusal to testify as an opportunity to place before the jury parts of her hearsay statement which out of context incriminated her husband, the accused. For this manifestly prejudicial conduct on the part of the prosecutor which adulterated the very integrity of the factfinding process, these causes are reversed and remanded.

It is so ordered.

W.C. DAVIS, McCORMICK and CAMP-BELL, JJ., dissent.

TEAGUE, Judge, concurring.

I find that the prosecuting attorney in this cause, after appellant's trial counsel got the "horse" up to the gate, got on the "horse," opened the gate, and thereafter rode the "horse" unmercifully. He caused much damage to appellant's pasture. The majority is correct in holding that reversible error was committed in this cause.

In *Glasper v. State,* 486 S.W.2d 350 (Tex. Cr.App.1972), up to a point, the same thing which happened in this cause happened there. In *Glasper,* a co-indictee was called by the defendant to testify. The witness refused to testify by invoking his Fifth Amendment privilege against self-incrimination. This Court set out the rules:

> The general rule is that when a witness, other than accused, declines to answer a question on the ground that his answer would tend to incriminate him, that refusal alone cannot be made the basis of any inference by the jury, either favorable to the prosecution or favorable to the defendant...
>
> The reason for the rule is that, in refusing to answer a question on the ground that the answer would tend to incriminate him, the witness is exercising a constitutional right personal to himself, the exercise of which would neither help nor harm a third person. If no inference of guilt can be indulged against the person who declines to testify, none could be drawn as to the guilt of a co-indictee...

After stating the rules, this Court then stated the following:

> This court recognizes that "when a witness claims his privilege, a natural, indeed an almost inevitable, inference arises as to what would have been his answer if he had not refused." ... In this regard, it is noted that it was the *appellant* who called the witness to testify; and that with apparent knowledge that the witness intended to invoke the Fifth Amendment privilege. At this point an inevitable inference arose that had the witness testified, he would have done so in behalf of the appellant. It is further noted, that *although the court overruled appellant's objection, the matter was abruptly dropped by the prosecutor.* No reversible error is shown. [Emphasis Added]

In this instance, the prosecuting attorney did not drop the matter.

By what is stated in the majority opinion in this cause, the prosecuting attorney *and* the trial attorney for the appellant knew that the witness was a co-indictee of the appellant. Once the witness was called by the appellant, the prosecuting attorney should have been on his feet objecting like crazy and requesting that a hearing be held outside the presence of the jury. He did neither, but allowed appellant's counsel to lead the "horse" to the gate. When the "horse" did not do anything, the prosecuting attorney, with permission of the trial judge, got on the "horse," opened the gate and unmercifully rode the "horse" through appellant's pasture, doing much inferential damage to the pasture.

The prosecuting attorney in this cause, in conjunction with the trial judge's overruling appellant's objection, caused too much damage to be done to appellant's pasture for reversible error not to have occurred. I, therefore, reluctantly concur to the reversal.