Affirmed and Memorandum Opinion filed April 26, 2007








Affirmed and Memorandum Opinion filed April 26, 2007.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-01151-CR

____________

 

IVAN CASTANEDA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 338th
District Court

Harris County, Texas

Trial Court Cause No. 1039108

 



 

M E M O R A N D U M   O P I N I O N

A jury convicted
appellant Ivan Castaneda of injuring his six-month-old daughter, H.M.C., and
assessed punishment at life imprisonment in the Institutional Division of the
Texas Department of Criminal Justice.  In a single issue, appellant contends
there is insufficient evidence to corroborate the testimony of accomplice
witness Donna Norman, H.M.C.=s mother.  We affirm.

 

 








I.  Factual and Procedural Background

Appellant had two
daughters with his common-law wife, Donna Norman. The couple=s older child,
C.N.C., is approximately nine months older than H.MC., who was born in July
2004. 

Appellant=s mother, Maria
Castaneda (ACastaneda@), testified that
she spoke with Norman on the night of February 1, 2005. Castaneda and Norman
had difficulty communicating because Castaneda primarily speaks Spanish, while
Norman speaks English.  According to Castaneda, Norman said she was going to a
store to get decongestant for H.M.C..  Castaneda also testified that Norman
appeared nervous and indicated that there was trouble in her relationship with
appellant.  Castaneda told Norman that, on the following morning, she would
visit the home Norman and appellant shared.[1]

Castaneda next saw
Norman at 8:00 or 8:30 the next morning.  Norman arrived at Castaneda=s house with both
children in her car.  According to Castaneda, Norman was very nervous and told
Castaneda to Ahurry, hurry, [H.M.C.] is very sick.@  Norman did not
know the way to the nearest hospital, so Castaneda went with Norman and gave
her directions to Doctors Hospital Parkway.  Castaneda stated that Norman was
upset about H.M.C.=s condition, was Adriving crazy@ and crying, and
when they arrived at the hospital, Norman took H.M.C. inside without parking
the car or closing her car door.  Castaneda parked the car and followed with
the older child. 

According to Dr.
Dayle Hein, the emergency room physician at Doctors Hospital, Norman told him
that she had reached into H.M.C.=s mouth at
approximately 6:00 p.m. the night before to retrieve a quarter that H.M.C.=s sibling had put
in the baby=s mouth.  Doctors subsequently discovered that the
baby=s tongue was
nearly severed.  According to Dr. Hein, none of the treatment H.M.C. received
at Doctors Hospital could have caused her injuries.








About half an hour
after arriving at Doctors Hospital, Castaneda drove to appellant=s residence to
take him to the hospital.  She testified that when she arrived at appellant=s home, A[h]e had already
showered and everything.  All he needed [to do] was to put on a shirt.@  Believing that
H.M.C. was being transferred to Texas Children=s Hospital,
Castaneda first took  appellant there before returning to Doctors Hospital.  

In the meantime, a
mobile critical care team had been dispatched to transport H.M.C. to Texas
Children=s Hospital.  Nurse
Kim McDonough was a member of that team, and testified that H.M.C. was in shock
when the team arrived and was too unstable to be moved.  McDonough observed
appellant, and in her opinion, he seemed extraordinarily well-groomed and
rested for the parent of a critically ill child.[2]  


After about four
hours, H.M.C. was stable enough to be moved, and she was transported to the
intensive care unit at Texas Children=s Hospital where
she remained on life support.  At approximately 7:00 p.m. that night, Dr. Zahid
Lalani examined the deep, ragged wound on the back of H.M.C.=s tongue.  He
determined that the wound was then twenty-four or thirty hours old and would
have bled a significant amount.  According to Dr. Lalani, the wound was a
serious bodily injury that must have been caused by something sharp.  He
testified that he would be surprised if it was caused by a fingernail.

Dr. Mona
McPhearson also treated H.M.C. on February 2, 2005.  She testified that, due to
shock, H.M.C. was not getting enough blood to her brain, heart, kidneys, and
lungs.  Dr. McPhearson agreed that blood flow restrictions and injuries to
H.M.C.=s brain, liver,
kidneys, and pancreas were serious bodily injuries, and that nothing done at
Doctors Hospital exacerbated H.M.C.=s problems.  








A full assessment
at Texas Children=s Hospital revealed that H.M.C. had
multiple lines of fractures to her skull; swelling of the brain; two broken
legs; one broken arm; fractures to her spine; two broken ribs; internal
contusions and bleeding around her liver, her right kidney, and pancreas from
blunt force trauma; a bruise on her back; abnormal respiration; and anal and
vaginal tears.  According to Dr. McPhearson, H.M.C.=s injuries were
not caused by a single blow.  Dr. McPhearson also testified that some of H.M.C.=s doctors
initially believed that a laceration to H.M.C.=s rectum was
caused by sexual assault, while others, including Dr. McPhearson, believed that
blunt force of such high pressure was applied to H.M.C.=s midsection that
she suffered Ablow-out@ injuries to her
rectum and vagina. 

In her opinion,
the injuries to H.M.C.=s liver, kidney, and pancreas occurred
between 2:00 a.m. and 8:00 a.m. on February 2, 2005.  She testified that
although H.M.C.=s head injury occurred near this time as
well, some of the fractures were older.  Dr. Richard Braverman similarly
testified that one of H.M.C.=s rib fractures was as much as a month
old, but her left arm had been fractured within ten days of the x-ray.  According
to Dr. Braverman, at least three fractures were Anew@ or Afresh.@  Pediatric
neurologist Jill Hunter testified that at least one of H.M.C.=s skull fractures
was several weeks old, but the specific head injury that caused H.M.C.=s brain to swell
in this instance happened between 5:00 p.m. and 9:00 p.m. on February 1, 2005. 
In addition, Dr. Hunter testified that H.M.C. sustained irreversible injuries
to her brain sometime within the preceding ten days.  Because she based this
opinion on an MRI performed on February 4, 2005, this injury would have
occurred sometime between January 25 and February 4, 2005.








Several law
enforcement officers testified regarding appellant=s unexpected
behavior while H.M.C. was at Texas Children=s Hospital. 
Sergeant Randall Upton, a plainclothes detective with the Houston Police
Department=s Juvenile Sex Crimes Unit, arrived at the hospital
around 9:00 p.m. on February 2, 2005.  Although H.M.C. was still struggling
with life-threatening injuries at that time, none of her family members were
there.  Norman and appellant subsequently returned to the hospital, and the
detective interviewed each of them separately in a waiting room.  According to
Sergeant Upton, appellant stated that he knew before he left the hospital that
police would be called, and that he had gone home, eaten, and relaxed before
returning.  Police officer Rafael Calles watched over Norman and appellant in the
waiting room that night, and he also testified regarding appellant=s inappropriate
behavior.  In particular, the mother of a patient spoke with appellant and Calles in the hospital waiting
room, and when the woman left, appellant told Calles, Ashe wants you.@  Police officer Thomas Simmons
testified that on the morning of February 3, 2005, he handcuffed appellant and
transported him to the police station.  According to Simmons, appellant asked
Simmons to find out the amount of his bail and became elated when he learned
that he was only being held for twenty-four hours. 

Norman also testified at trial.  Like
appellant, Norman was indicted for injury to a child in connection with H.M.C.=s injuries, and is an accomplice as a
matter of law.  She received Ause immunity@ for her testimony at appellant=s trial but had not negotiated a plea
regarding the charges against her.[3]  

According to Norman, appellant had
stopped working in December, and in January, he had begun squeezing H.M.C.=s cheeks or abdomen when she cried. 
During this time, Norman had also seen appellant put his finger down H.M.C.=s throat when she cried, causing the
baby to bleed from the mouth.

Norman testified that H.M.C. had
seemed congested for about two weeks before February 1.  She further testified
that on the evening of January 31, appellant had put H.M.C. in the children=s room, and after lying down in his
own room for a few minutes, he returned to the children=s room.  According to Norman, she
then went to the children=s room because she did not trust appellant alone with the
children.  She testified that when she entered the room, H.M.C. was crying and
bleeding from the mouth.  According to Norman, she told appellant she was
taking the children and leaving, but he refused to allow them to leave while they
still had visible bruises.  








Norman also testified that on the
night of February 1, she left the house for a moment to retrieve diaper bags
from the car.  When she returned, appellant had locked himself in the children=s room with the two girls, and Norman
heard H.M.C. screaming.  When appellant opened the door, H.M.C. was not in the
swing where Norman had left her; instead, she was lying in the playpen, and
both of her legs were limp.  Norman further testified that H.M.C. was again
bleeding from her mouth, had red marks Alike a handprint@ on her belly, and could not move her
left arm.  According to Norman, appellant again stopped her from leaving.  She
testified that she tried telling appellant that H.M.C. needed medical
attention, but appellant refused to let her leave the house with the children. 
According to Norman, she was able to persuade appellant that she wanted to leave
to get decongestant for H.M.C. without leaving the children with him.  Norman
said that appellant agreed to wait across the street for her to return.

Norman testified that she then left
her daughters alone in the house and drove to the home of appellant=s mother, Castaneda.  According to
Norman, she informed Castaneda that she had told appellant she was going out to
get decongestant for H.M.C.  More importantly, Norman testified that she told
Casteneda that she wanted to leave appellant because of his treatment of the
children, but he would not let them leave.  Norman testified that Castaneda
agreed to come to the house the next day to help Norman leave with her
children.  Norman then went to a store and stole decongestant for H.M.C. before
returning home.  She was gone a little over an hour.  








Norman testified that when she
returned, appellant was across the street, and H.M.C., who was crying, had
dried blood on her mouth.  She did not know if appellant entered the house
while she was gone.  According to Norman, she tried to stay awake all that
night to watch over the children and went into the bathroom at around 6:00 a.m.
to splash water on her face to help her wake up.  While she was in the bathroom,
she heard H.M.C. scream, and when she returned to her room, she found the door
bolted.  Norman testified that she was able to shake the door open and saw
appellant holding H.M.C., who was crying.  She further testified that after an
argument, appellant let her have the baby, and she put H.M.C. on a couch in the
same room with them.  

According to Norman, she
inadvertently dozed off after this, and when she awoke at around 8:00 a.m., she
saw that appellant was already awake.  Norman testified that she heard H.M.C.
gasping for air, and when she looked at her, she discovered that the baby was
blue, hot, limp, and her eyes were large and glazed.  According to Norman, she
urged appellant to let her take the baby to a doctor, but appellant took the
car keys and again refused to allow them to leave.  Norman testified that
appellant relented when she said that she would take responsibility for
anything that was wrong with the baby.

Norman was cross-examined regarding
her inconsistent statements at the hospital and to the grand jury.  She
answered that when she was questioned at the hospital, appellant was
immediately outside the door and could hear her replies; in addition, she was
afraid to  implicate appellant because her older daughter was in the care of
appellant=s sister.[4]  She
testified that she also was afraid of what appellant might do if he was
released on bond.

 The jury was charged that it could find
appellant guilty of injury to a child by intentionally or knowingly causing
serious bodily injury to H.M.C. or by injuring her recklessly.  In addition,
the jury was permitted to convict appellant for injuring H.M.C. by various acts
or by omission.  The jury found that appellant intentionally and knowingly
caused serious bodily injury to H.M.C.  This appeal ensued.  

                                                              

II.  Issue Presented

In his sole issue
on appeal, appellant contends there is insufficient evidence to corroborate
Norman=s accomplice
witness testimony, and thus, the evidence is insufficient to sustain his
conviction as a matter of law. 

 








 

III.  Analysis

A.      Governing
Law

 The Texas Code of
Criminal Procedure provides that A[a] conviction
cannot be had upon the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.@  Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 2006).  A challenge of
insufficient corroboration is not the same as a challenge of insufficient
evidence to support the verdict, and thus, is reviewed under a different test. See
Cathey v. State, 992 S.W.2d 460, 462B63 (Tex. Crim.
App. 1999) (en banc); Torres v. State, 137 S.W.3d 191, 196 (Tex. App.CHouston [1st
Dist.] 2004, no pet.) (citing Cantelon
v. State, 85 S.W.3d 457, 460 (Tex. App.CAustin 2002, no
pet.)).  

To determine
whether sufficient corroboration exists, we first eliminate the accomplice
witness=s testimony from
consideration and then determine whether any of the remaining evidence tends to
connect the accused with the commission of the crime.  Longoria v. State,
154 S.W.3d 747, 758 (Tex. App.CHouston [14th Dist.] 2004, pet. ref=d).  The
corroborating evidence need not be sufficient in itself to establish guilt or
directly link the accused to the crime.  Id.  Rather, the
accomplice-witness rule is satisfied if there is some non-accomplice evidence
that tends to connect the accused to the commission of the offense alleged in
the indictment.  Id. 








To decide this
issue, we view the evidence in the light most favorable to the jury=s verdict and
determine whether a reasonable jury could conclude that the non-accomplice
evidence, taken as a whole, tends to connect the appellant to the offense.  Gill
v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (en banc).  Taken in
isolation, suspicious circumstances such as the accused=s presence at the
scene of the crime, motive, or opportunity to commit the crime are not by
themselves sufficient to corroborate the accomplice witness testimony.  See
id. at 49; Jeffery v. State, 169 S.W.3d 439, 447 (Tex. App.CTexarkana 2005,
pet. ref=d).  But
cumulative suspicious circumstances may tend to connect the accused to the
charged offense, even if none of the circumstances is individually sufficient
to do so.  Gill, 873 S.W.2d at 49.  Viewed collectively, even apparently
insignificant incriminating circumstances may tend to connect the accused to
the charged offense.  Dowthitt v. State, 931 S.W.2d 244, 249 (Tex. Crim.
App. 1996).  Accordingly, we look at all of the facts and circumstances in
evidence to supply the necessary corroboration.  Moore v. State, 700
S.W.2d 193, 203 (Tex. Crim. App. 1985) (en banc), cert. denied, 474 U.S.
1113, 106 S. Ct. 1167, 89 L. Ed. 2d 289 (1986).  We then examine Athe combined and
cumulative weight of the evidence@ in determining
whether the accomplice testimony is sufficiently corroborated.  Cox v. State,
830 S.W.2d 609, 611B12 (Tex. Crim. App. 1992) (en banc).

B.      Corroborating Evidence

Here, appellant
admits that he and Norman were alone with their children during the time the offense
occurred.  Although appellant=s mere presence during the commission of
the offense is not itself sufficient corroboration, we do not consider this
fact in isolation, but view it together with other suspicious circumstances.  Id. 
For example, when asked about H.M.C.=s injuries,
appellant told police, AI know my wife didn=t cause these
injuries.@  This statement constitutes additional corroborating
evidence.  See Jeffery, 169 S.W.3d at 447 (considering as corroborating
evidence an appellant=s statements that the other person at
appellant=s residence Adidn=t have anything to
do with this@).     








A reasonable jury
also could have considered it suspicious that appellant repeatedly manifested a
lack of concern about H.M.C.=s condition.   For example, appellant told
police that the child=s sickness Agot really bad@ the night before,
and Norman told him that H.M.C. was Anot doing good.@  But appellant
stated,  AI didn=t think too much
of it, I thought maybe it was a cold or something that she would get over
it.@ (emphasis
added).  Appellant=s statement to police further illustrates
his apparent lack of concern when contrasted with his description of Norman=s reaction when
she saw the child=s grave condition.  According to appellant=s statement to
police, appellant awoke after Norman checked on the baby and Ashe finds out that
[H.M.C.]=s not doing right,
she starts you know, screaming and uhm, you know, talking out loud and telling
me, she=s getting all dramatic, and telling me
that the baby=s not right, the baby=s not right.@ (emphasis added).


In contrast to Kim
McDonough, who described appellant as Avery excited@ when H.M.C. was
at Doctors Hospital,[5]
Sergeant Upton described a very different demeanor when appellant was later
questioned by police at Texas Children=s Hospital. 
According to Sergeant Upton, appellant Ashowed no emotion
the entire interview [as] we talked to him.  He was very calm,
still. . . . [H]e wasn=t excited, no body
movement, no hand gestures.  He sat there, stared coldly into my face, answered
the questions and gave the explanations you guys heard on the tape.@  Because
appellant=s tape-recorded statement was played for the jury, the
jury also had the opportunity to independently evaluate appellant=s speech and tone
of voice, and could have found his controlled tone suspicious. 

Other Asuspicious
circumstances@ that tend to connect appellant to the offense may be
found in his own conduct.  In contrast to Norman, who actively sought medical
assistance for her injured child, appellant did not take the child to a doctor
when he was first aware that her condition had worsened.  Moreover, he did not
accompany the child to the hospital when she was eventually taken there, even
though, in his own words, the child was Acritical to where
she barely made it to the hospital.@  Thus, a
reasonable jury could have found that both medical evidence and appellant=s own statements
tend to connect appellant with the offense of injury to a child by omissionCspecifically,
failing to provide medical care for his daughter.       








The jury may also
have considered appellant=s shifting versions of events as an
indication that he actively injured the child.  For example, appellant
vacillated between saying that he never woke during the entire preceding night
and stating that he woke when Norman checked the baby every hour or so.  A
reasonable jury could have concluded that this was an attempt to adapt his
story to meet the evolving evidence regarding the time that H.M.C. was
injured.  See Prieto
v. State, 879 S.W.2d
295, 300 (Tex. App.CHouston [14th Dist.] 1994, pet. ref=d) (considering an appellant=s changing versions of events as evidence supporting the
jury=s finding of
guilt).  In addition, appellant told police that he instructed Norman to take
the baby to the hospital but said he did not accompany her because AI was in my
underclothes.  There was no time for me to get ready or anything, she
automatically just left.@  But immediately before this statement,
appellant told the same police officer that he had not changed clothes since
the previous night and was still wearing the clothes he had slept in the night
before.  In effect, appellant refuted the only explanation given for his
failure to accompany his critically ill child to the hospital.  

A jury could also
have found appellant=s first version of events implausible. 
Appellant=s mother testified that both C.N.C. and H.M.C. were in
the car with Norman on the drive to the hospital and that both were in child
safety seats.  Thus, the non-accomplice evidence shows that Norman could not
have left home in less time than it took to put two children, both under the
age of two, into the seats.  Drawing on common experience and common sense, the
jury could have found that the time required by the parent of a sick child to Aget ready@ to seek medical
help is less than the time required to put two small children into car safety
seats. 








These are not the
only reasons appellant=s statement could be considered
suspicious.  Appellant=s mother testified that he had showered
before she arrived to take him to the hospital, and other witnesses noted
appellant=s well-groomed appearance.  A reasonable jury could
have inferred that appellant untruthfully denied showering and changing because
he wanted to insure that if police tested his clothing for H.M.C.=s blood, they
would test the clean clothes he was now wearing rather than the clothes he had
worn at the time H.M.C. was injured.  See Guevara v. State, 152 S.W.3d
45, 50 (Tex. Crim. App. 2004) (AAttempts to conceal incriminating evidence,
inconsistent statements, and implausible explanations to the police are
probative of wrongful conduct and are also circumstances of guilt.@).  

Viewing the
cumulative weight of the foregoing evidence in the light most favorable to the
jury=s verdict, we hold
that a reasonable jury could have found Norman=s testimony to be
sufficiently corroborated.  See Gill, 873 S.W.2d at 48.  Appellant=s statements place
him in the company of the accomplice at the time of the offense, thereby
establishing his opportunity to commit the crime.  When considered in
conjunction with his statement that Norman did not injure H.M.C., his apparent
lack of concern for H.M.C.=s grave condition, his implausible
explanation for failing to accompany his family to the hospital, his
inappropriate behavior, and his shifting versions of events, a reasonable jury
could have found that the cumulative non-accomplice evidence tended to connect
appellant to the offense of injury to a child as charged.  Accordingly, we
overrule appellant=s sole issue.  

 

IV.  Conclusion

Having overruled
appellant=s sole issue in this appeal, we affirm the judgment of
the trial court. 

 

 

 

 

/s/      Eva M. Guzman

Justice

 

 

 

 

Judgment
rendered and Memorandum Opinion filed April 26, 2007.

Panel
consists of Justices Anderson, Hudson, and Guzman.

Do Not
Publish C Tex. R. App. P.
47.2(b).









[1]  The trial court sustained appellant=s hearsay objection to his mother=s attempt to further relate the content of the
conversation she had with Norman that night.





[2]  When H.M.C. was later moved to Texas Children=s Hospital, Dr. Mona McPhearson saw both appellant and
Norman.  She later described them both as freshly showered.





[3]  As a result, the State cannot use the testimony
Norman gave in appellant=s trial against her when her own case is tried.  





[4]  C.N.C. was later placed in foster care. 





[5]  A full assessment was not performed at Doctors
Hospital because doctors first had to stabilize H.M.C.  Based on the
information then available, H.M.C. was diagnosed with sepsis.  The
investigation for abuse did not begin until a full assessment at Texas Children=s Hospital revealed her internal injuries and
fractures.