Opinion issued April 1, 2004










     





In The
Court of Appeals
For The
First District of Texas




NO. 01–01–01195–CR




THELMA YOLANDA TORRES, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 183rd District Court
Harris County, Texas
Trial Court Cause No. 853997




O P I N I O N
          A jury found appellant, Thelma Yolanda Torres, guilty of possession with
intent to deliver at least 400 grams of cocaine, and the trial court assessed punishment
at 30 years’ confinement. Because we find that appellant’s complaint regarding the
trial court’s refusal to submit a requested jury instruction requires us to reverse the
judgment and remand the cause, we need only discuss that issue and appellant’s
complaint regarding the legal sufficiency of the evidence.


 We reverse and remand.
The Evidence
A. Confidential informant testimony
          Ramon Deleon testified that he worked as a confidential informant for Officer
Tom Hanslik of the Houston Police Department (HPD) and Special Agent Brian
Haltom of the Drug Enforcement Administration (DEA). On August 25, 2000,
Deleon met with Hanslik and Haltom and discussed an undercover drug operation. 
Before the meeting, Haltom searched Deleon and the car the officers had supplied to
him for the operation and found no drugs.
          Deleon then drove to a restaurant to meet with a man known as “Alfredo.” 
Alfredo, later identified as Oscar Moncada, was already in the restaurant with two
women. Deleon identified one of the women as appellant. After Deleon sat down,
appellant greeted him, then the other woman and Moncada greeted him. Deleon
asked if he could purchase 20 kilos of cocaine. Appellant responded that if he bought
five kilos first, then she would get Deleon the other 15 kilos. Deleon responded that
that was ok, but he indicated he first wanted to “see if [the cocaine] was any good.” 
Appellant wanted $16,500 per kilo, but later she and Moncada agreed to take $16,400
per kilo. After spending about 20 minutes in the restaurant, Deleon and Moncada left
in the undercover car that had been provided to Deleon by the DEA, and appellant
and the other woman left in a silver Mustang. When Deleon and Moncada arrived at
a trailer park, the two women were already there.
          The four went inside a trailer and Deleon asked, “Where is [sic] the drugs?” 
Appellant told Moncada, “Show it to him. It’s in the bedroom.” Appellant took a bag
out of the closet and placed it on the bed. After seeing that all of the requested kilos
were present, Deleon took a small sample of the cocaine from a hole in the top of one
of the bricks. Deleon told them that if the cocaine was any good, he would call them
in about an hour. 
          Deleon left the trailer and told Special Agent Haltom, who was monitoring
audio transmitting equipment in the undercover car, that “Brian, I have a sample for
you. Call me if you want it. I am on my way out.” He also mentioned to Haltom that
“there were two girls [and a man] with five kilos of cocaine. Deleon gave the sample
to Haltom, who determined, after a performing a field test, that it was cocaine.
B. Other testimony
          1. HPD Officer Tom Hanslik
          Officer Hanslik testified that he and Special Agent Haltom met with Deleon on
August 25, 2000, to discuss an undercover narcotics operation. Hanslik testified that
Haltom searched Deleon and the undercover car before Deleon left to meet with
Moncada at a restaurant. Hanslik testified that he and Haltom maintained physical
surveillance on Deleon until he went into the restaurant around 2 p.m. that afternoon. 
About 20 minutes later, Deleon left the restaurant with Moncada and two women. 
Hanslik identified one of the women as appellant. Deleon and Moncada drove in the
undercover car and appellant and the other woman drove in a Silver Mustang. The
officers maintained surveillance by an airplane overhead until Deleon, Moncada,
appellant, and the other woman arrived at a trailer park and went inside a trailer.
          At approximately 2:36 p.m., Deleon left the trailer, met Hanslik and Haltom,
and gave them a cocaine sample, which he told them he had obtained at the trailer. 
The officers searched Deleon and the undercover car again, and then field tested the
sample, which was positive for cocaine. Hanslik left to obtain a search warrant.
          The search warrant for the trailer was served at approximately 5:30 p.m. 
Hanslik arrested appellant in the living room of the trailer. Moncada and the other
woman were also arrested. Six kilograms of marihuana were recovered from the
bedroom of the trailer, which was in a broad area connected to the room where
appellant was arrested. Thirty-two grams of cocaine were recovered from a matchbox
on the kitchen counter. Six kilograms of cocaine were recovered from a box outside
the trailer, which was near a broken-down van.
          2. Cornell Wilson, chemist
          Cornell Wilson, a forensic chemist for the DEA, testified that the total weight
of the cocaine recovered outside the trailer was approximately 5000 grams, or five
kilograms.
          3. Edwin Kroschell, air surveillance
          Edwin Kroschell, a detective with the Harris County Sheriff’s Department,
testified that he was conducting visual surveillance of the trailer from an airplane on
the date of appellant’s arrest. Beginning around three o’clock, Kroschell saw some
people come and go from the trailer in a Silver Mustang and saw another woman
arrive in a taxi. Around five o’clock, a man went outside the trailer and began
looking around as if he were waiting for someone. He then saw that same male run
out of the back door of the trailer with a package in his hand. The man placed the
package near the rear of an old van and then ran back in the trailer. As soon as the
man got back to the trailer, the officers arrived to execute the search warrant.
          4. Domingo Guerra, HPD officer
          After the officers executed the search warrant, HPD officer Domingo Guerra
and his canine partner, Bo, were called to the scene to perform a narcotics check on
the silver Mustang. Bo alerted on the center console of the Mustang, but no narcotics
were found in the car. Guerra testified that about 99 percent of the time, he finds
drugs when Bo makes a positive alert. He was surprised to find no drugs in the car,
and concluded that at some point in time, there had been narcotics in the center
console and that Bo reacted to the scent left behind.
          5. Brian Haltom, DEA Special Agent
          Special Agent Haltom testified that he had used Deleon on several occasions
in the past and had found him to be a reliable and credible informant. On the day of
appellant’s arrest, Haltom and his partner, Hanslik, met with Deleon at 1:30 p.m. to
plan an undercover meeting between Deleon and “Alfredo,” also known as Oscar
Moncada. Haltom searched Deleon and the undercover car that was to be used in the
operation. Haltom and Hanslik then followed Deleon to a restaurant, where they saw
him meeting with Moncada and two women. After about 15 or 20 minutes, Deleon
left with Moncada in the undercover car and the two women, one of which was
appellant, left in a silver Mustang. 
          Haltom followed them to a trailer park. When Deleon left the trailer, he met
with Haltom and gave him a sample of suspected cocaine, which field-tested positive. 
Haltom then searched Deleon again and found no more drugs. Haltom waited with
Deleon while Hanslik went to get a search warrant. During this time, a third woman
arrived at the scene in a taxi and Deleon received several telephone calls. When
Hanslik returned with the search warrant, the raid team entered the trailer and arrested
a man (Moncada) and two women (one of which was appellant); a third woman was
not taken into custody. 
          Haltom testified that the street value of the cocaine recovered from the scene,
if converted to crack cocaine, would have been approximately half a million dollars.
Corroboration of Confidential Informant Testimony
          Article 38.141 of the Texas Code of Criminal Procedure provides as follows:
(a) A defendant may not be convicted of an offense under Chapter 481,
Health and Safety Code, on the testimony of a person who is not a
licensed peace officer or a special investigator but who is acting covertly
on behalf of a law enforcement agency or under the color of law
enforcement unless the testimony is corroborated by other evidence
tending to connect the defendant with the offense committed.
 
(b) Corroboration is not sufficient for the purposes of this article if the
corroboration only shows the commission of the offense.

Tex. Code Crim. Proc. Ann. art. 38.141 (Vernon Supp. 2004).
          In point of error seven, appellant contends the evidence is legally insufficient
to corroborate Deleon’s testimony. We look to article 38.14 of the code of criminal
procedure, regarding corroboration of accomplice witness testimony, when
interpreting article 38.141. Young v. State, 95 S.W.3d 448, 450-51 (Tex.
App.—Houston [1st Dist.] 2002, pet. ref’d).
          A challenge of insufficient corroboration is not the same as a challenge of
insufficient evidence to support the verdict as a whole. See Cantelon v. State, 85
S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.) (citing Cathey v. State, 992
S.W.2d 460, 462-63 (Tex. Crim. App.1999) (applying the accomplice-witness rule)).
In determining whether there is “other evidence” tending to connect an accused with
the offense in an analysis under article 38.14, a court must “eliminate all accomplice
evidence and determine whether the other inculpatory facts and circumstances in
evidence tend to connect appellant to the offense.” McDuff v. State, 939 S.W.2d 607,
612 (Tex. Crim. App. 1997); Brown v. State, 672 S.W.2d 487, 488 (Tex. Crim. App.
1984) (“[t]he test . . . is to eliminate from consideration the evidence of the
accomplice witness and then examine the testimony of other witnesses to ascertain
if there is inculpatory evidence which tends to link the accused with the commission
of the offense.”). The “testimony” that is to be eliminated from consideration is that
testimony given by live witnesses speaking under oath in court. Bingham v. State,
913 S.W.2d 208, 210 (Tex. Crim. App. 1995). 
          Non-accomplice evidence does not, by itself, have to establish the guilt of the
defendant beyond a reasonable doubt, but it does have to connect the defendant with
the offense. McDuff, 939 S.W.2d at 612. While the accused’s mere presence in the
company of the [informant] before, during, and after the commission of the offense
is insufficient by itself to corroborate the testimony, evidence of such presence,
coupled with other suspicious circumstances, may tend to connect the accused to the
offense. Dowthitt v. State, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (interpreting
accomplice witness corroboration requirement). Even apparently insignificant
incriminating circumstances may sometimes afford satisfactory evidence of
corroboration. Id. Where corroborating evidence required for a conviction is lacking,
the defendant will be entitled to a verdict of acquittal. Tex. Code Crim. Proc. Ann.
art. 38.17 (Vernon 1979).
          In determining whether the article 38.141 “other evidence” requirement was
satisfied, we will follow the approach used in McDuff and eliminate from our
consideration all of Deleon’s testimony. The requirements of article 38.141 will have
been met if we find some “other evidence” that tends to connect appellant with the
cocaine transaction. We view the corroborating evidence in the light most favorable
to the finding of guilt. Cantelon, 85 S.W.3d at 461 (citing Knox v. State, 934 S.W.2d
678, 686-87 (Tex. Crim. App. 1996)). 
          In Young, we held that the corroboration of the informant’s testimony was
legally insufficient because the only evidence linking the defendant to the drug
transaction was the informant’s identification of the house in which he had conducted
the drug transaction and the informant’s identification of the defendant’s voice on an
audiotape. 95 S.W.3d at 452.
          In this case, however, Officer Hanslik and Special Agent Haltom saw Deleon
go into the restaurant and then leave with appellant, Moncada, and the other woman. 
Both positively identified appellant as one of the women in the restaurant. Hanslick
and Haltom both saw appellant go into the trailer with Deleon, Moncada, and the
other woman. Detective Edwin Kroschell, who was performing air surveillance
above the trailer, also saw people get out of a silver Mustang and go in the trailer;
appellant was driving the silver Mustang. When Deleon came out of the trailer, he
had a cocaine sample that he did not have with him before he went in the trailer. 
Appellant remained in the trailer the entire time that Deleon was away “checking out
the sample.” When the officers executed the search warrant, they discovered drugs,
albeit marihuana, not the cocaine, in the bedroom of the trailer, as Deleon testified. 
Detective Kroschell testified that he saw a man moving a box outside immediately
before the arrests and the cocaine was discovered in the same outside location. The
box contained five kilograms of cocaine, the exact amount that Deleon testified that
appellant offered to sell him. The bedroom in which the marihuana was located was
adjacent and open to the room in which appellant was sitting when arrested. Finally,
the drug-sniffing dog, Bo, positively alerted on the silver Mustang that appellant had
been driving, indicating that at some point in time drugs had been located in the car. 
          Although the evidence, without Deleon’s testimony, may have been insufficient
to show appellant’s guilt, it was, nevertheless, sufficient to connect appellant to the
offense. Because appellant’s arguments regarding the sufficiency of the evidence rest
on the supposition that Deleon’s testimony should be disregarded, which we will not
do, we overrule appellant’s seventh point of error.



Jury Charge on Invocation of Fifth Amendment Rights by Co-Defendant
          During trial, the State called appellant’s co-defendant, Oscar Moncada, to the
stand to testify. After a few preliminary questions, Moncada invoked his Fifth
Amendment privilege against self-incrimination and refused to testify further. In
point of error two, appellant contends the trial court erred by refusing to include an
instruction in the jury charge that it could not draw any inference from Moncada’s
refusal to testify based on his assertion of his Fifth Amendment privilege against self-incrimination.
          1. Error
          When a defendant alleges a jury charge error, we must first determine whether
there is any error in the charge. Hutch v. State, 922 S.W.2d 166, 170 (Tex. Crim.
App. 1996); Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986).
          Rule 513(d) of the Texas Rules of Evidence provides:
 . . . [U]pon request any party against whom the jury might draw an
adverse inference from a claim of privilege is entitled to an instruction
that no inference may be drawn therefrom.

Tex. R. Evid. 513(d). 
          It is undisputed that appellant requested an instruction that the jury draw no
inference from Moncada’s invocation of his Fifth Amendment privilege. However,
the State argues that, in this case, rule 513(d) does not require an instruction because
the jury could not have drawn any “adverse inference” against appellant because of
Moncada’s claim of privilege. We disagree.
          The jury had already been informed in opening statements that Moncada was
a co-defendent with appellant in this case. Moncada appeared to testify in his prison
jumpsuit, and, when the State began questioning about why he was in jail (he had
pleaded guilty to the same offense appellant was charged with), Moncada claimed the
Fifth Amendment privilege against self-incrimination. The obvious “adverse
inference” to be drawn by the jury in this case was that Moncada’s testimony would
incriminate him. Because appellant was charged as a party to Moncada’s offense,
such an inference could also tend to incriminate appellant, his co-defendant. In other
words, by creating an inference that Moncada was guilty, the State needed only then
to prove that appellant “solicited, encouraged, directed, aided or attempted to aid”
Moncada. Any inference that Moncada was guilty could implicate appellant, who
was charged as a party with Moncada. Therefore, we conclude that after appellant
requested the instruction, the trial court erred by refusing to include the instruction
in the charge.



 
          2. Harm
          Having determined that the charge contains error, and the defendant
specifically objected to the error at trial, we reverse if the error was calculated to
injure the rights of the appellant, which means no more than that there must be “some
harm” to the accused from the error. Abdnor v. State, 871 S.W.2d 726, 732 (Tex.
Crim. App. 1994). Under that analysis, reversal is required if the error resulted in
some harm to the accused, “some” meaning “any.” Arline, 721 S.W.2d at 351. In
determining whether the error was harmful and reversal is required, an evidentiary
review must be conducted, as well as review of any part of the record as a whole that
may illuminate the actual, not just theoretical, harm to the accused. Arline, 721
S.W.2d at 351; Almanza v. State, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984). For
this review, the presence of actual harm must be assayed in light of the entire jury
charge, the state of the evidence, including the contested issues and weight of
probative evidence, the argument of counsel, and any other relevant information
revealed by the record as a whole. Almanza, 686 S.W.2d at 171. If any harm is found
after conducting this review, then reversal is required. Abdnor, 871 S.W.2d at 732.
          The jury charge in this case authorized appellant’s conviction if she “with the
intent to promote or assist the commission of the offense, if any, solicited,
encouraged, directed, aided or attempted to aid Oscar Moncada and/or Martha
Maldonado to commit the offense . . .” Thus, the issue of whether Oscar Moncada
committed an offense was extremely important to the resolution of appellant’s case. 
The jury could have inferred from Moncada’s invocation of his privilege against self-incrimination that he must be guilty of the offense. Because appellant was charged
as a party to the offense with Moncada, such an inference would necessarily relieve
the State from the burden of proving an element of its case, i.e., that Moncada
committed an offense. 
          The prosecutor relied on the law of parties in his closing argument, during
which he stated, “This is saying that if you believe Ms. Torres, the defendant aided
or assisted one of the other individuals, Martha Maldonado or Oscar
Moncada/Alfredo in the commission of this offense, she is just as guilty as everybody
else.” Establishing Moncada’s guilt through the negative inference created by his
invoction of the Fifth certainly assisted the State in proving its case against appellant.
          The only evidence in this case that directly linked appellant to the cocaine came
from the State’s confidential informant. While we have already held that the
informant’s testimony was sufficiently corroborated, we do believe it important to
note that the State’s case against appellant rested largely on the testimony of a paid
informant. 
          We also note that the jury had a difficult time reaching a verdict in this case. 
During the deliberations, the jury sent out two notes—one asking for additional
testimony about the order in which Moncada, appellant, Deleon, and the other woman
entered the trailer and the second asking to see the search warrant and all its
attachments. After about three hours of deliberation, the jury sent out a note
indicating that it was deadlocked 6 to 3. The trial court read an Allen


 charge to the
jury before allowing them to go home for the night. The next morning at 9:00, the
jury was given a written Allen charge. At 10:06 a.m., the defense moved for a mistrial
because the jury had still not reached a verdict. Sometime after lunch, the jury finally
reached a unanimous verdict.
          In light of the factors discussed above, we hold that the trial court’s refusal to
submit a charge under Rule 513(d) caused “some harm” to appellant. Accordingly,
we sustain point of error two. 
 
 
 
 
 
 
Conclusion
          In light of our disposition of points of error seven and two, we need not address
appellant’s remaining issues, and decline to do so. We reverse the judgment of the
trial court and remand for further proceedings.
 
                                                             Sherry Radack
                                                             Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Higley.

Publish. Tex. R. App. P. 47.2(b).