Opinion issued July 31, 2008 









 









In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00858-CR

____________


RYAN LANCE HUDNALL, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 179th District Court

Harris County, Texas

Trial Court Cause No. 1128677






MEMORANDUM OPINION

 A jury found appellant, Ryan Lance Hudnall, guilty of the offense of
aggravated kidnapping, (1) and the trial court assessed his punishment at confinement
for fifteen years. Appellant presents six issues for our review. In his fourth and fifth
issues, appellant contends that the evidence is legally and factually insufficient to
support his conviction. In his second and third issues, appellant contends that the
trial court erred in allowing the State to call a codefendant to testify and in refusing
to instruct the jury that it could draw no inference of appellant's guilt from the
codefendant's silence. (2) In his first issue, appellant contends that the trial court erred
in admitting the codefendant's testimony in violation of his Sixth Amendment (3) right
to confrontation. In his sixth issue, appellant contends that the trial court erred in
determining his punishment absent a valid waiver of his right to have the jury
determine his punishment.

 We reverse and remand.

Factual Background

 Mike Duke, the complainant, testified that in 1995, he and appellant's brother,
Rodney Hudnall, became instant friends when the complainant, a general manager at
a local Comp USA store in Oklahoma City, worked with Rodney as his boss. In
1997, Comp USA promoted the complainant to a position as a regional manager, and
Rodney moved to Houston to work under the complainant. In 1999, when Kinko's
hired the complainant, Rodney left Comp USA and went to Kinko's. By 2004, the
complainant and Rodney both worked as store managers for different Best Buy stores
in the Houston area. The complainant and Rodney opened two restaurants together
in 2004. Rodney contributed $105,000 to the venture before both restaurants went
bankrupt in 2004 and 2006. Rodney eventually sued the complainant, alleging that
his money in the restaurants was a loan, not a capital contribution. Before April 2,
2006, however, the trial court dismissed the lawsuit. 

 The complainant further testified that on April 2, 2006, he called Rodney and
left him a voice message. Rodney returned his call, and the complainant told Rodney
that he would talk to Rodney after he finished work at Best Buy. Leaving work at
approximately 3:00 p.m., the complainant was on his cellular telephone talking with
Rodney and walking towards his car, when, suddenly, he heard car brakes squealing
behind him. An African-American assailant quickly got out of the passenger seat of
a car, pointed a gun at his head, and screamed, "[Y]ou're under arrest [and] [g]et on
the ground." The complainant dropped to the ground and was handcuffed with a zip-tie while a gun was mashed against his head. The other assailant, who was
Caucasian, had a gun pointed at the complainant while the first assailant attempted
to force the complainant into the car. The complainant last remembered seeing a
police officer before paramedics took the complainant to the hospital. 

 Dawn Creason testified that, on April 2, 2006 at approximately 3:00 p.m., after
parking her car at a Best Buy store, a white, four-door, "Lincoln Town Car" pulled
into the parking lot and two men, wearing black ski masks and "SWAT" and
"NARCOTICS" shirts, exited the car with guns. The men forced the complainant
onto his knees with his hands behind his head. Initially, Creason believed that the
two men were police officers, but this impression faded when she saw the two men
slam the complainant onto the ground and kick him while attempting to force him
into their car. Pasadena Police Department Officer J. Eilers ran out of Best Buy,
causing the assailants to flee without the complainant. Creason described one of the
assailants as an African-American male and the other assailant as an African-American or a Hispanic male.

 Officer Eilers testified that, while working off-duty as a security officer at Best
Buy, the two assailants attempted to force the complainant into a white "Mercury,"
and, when Eilers ran outside, the assailants fled, leaving the complainant handcuffed
with a zip-tie and bleeding. Eilers could not identify either the race of the assailants
or the model of the Mercury. However, he remembered that the Mercury's license
plate number was "Y22GMJ." Pasadena Police Department Officer R. Hunt testified
that on April 2, 2006, after the offense and less than one mile from Best Buy, police
officers located a red, Ford Taurus with a front license plate number that matched the
license plate number of the car that Officer Eilers saw at the scene. The back license
plate of the Ford Taurus was missing.

 Pasadena Police Department Detective I. Villarreal testified that on April 14,
2006, he learned from The Hertz Corporation ("Hertz") that appellant had rented a
white Mercury Grand Marquis from April 1, 2006 through April 2, 2006. (4) Appellant
secured the rental with his Visa credit card before paying cash. Hertz's business
records also showed that on March 31, 2006, appellant's friend, Clayton Adams, tried
to change the reservation. With the credit card lead from Hertz, Villarreal obtained
appellant's Visa credit records, which showed a transaction at approximately
midnight on April 1, 2006 with the Carter Bonding Company in Big Cabin,
Oklahoma. 

 Detective Villarreal further testified that he obtained appellant's cellular
telephone records, which showed that appellant's cellular telephone was used in
Kansas City. However, appellant's cellular telephone records also showed that on
April 1, 2006 and April 2, 2006, his cellular telephone was used in Houston. 
Specifically, the records showed that the telephone company's tower closest to the
Best Buy registered three hits and the tower closest to the Leisure Inn (5) registered
thirty-eight hits from appellant's cellular telephone. (6) When Villarreal and local law
enforcement arrested appellant in Kansas City, they did not discover any evidence in
appellant's house which directly linked him to the offense. (7)

 Clayton Adams, after being granted use immunity, testified that on March 31,
2006, he, appellant, and Derrick Henderson left their hometown of Kansas City for
a car trip to Houston. Appellant's brother, Rodney, had told Adams that he would
pay Adams $500 to go on the trip. When the State asked what he was going to do
when he got to Houston, Adams responded, "Just going to basically go down there
and talk to somebody and intimidate some guy about some money that was owed." 
Adams explained that the money was owed to appellant's "brother." (8) Although he
did not know many details of the plan, Adams did remember that they were to wear
"D.E.A. shirts." 

 Adams explained that he did not make it with appellant and Henderson to
Houston because, when they were in Big Cabin, Oklahoma, police officers stopped
Henderson, who was driving the car, for making an illegal left turn. The officers
discovered that Adams was on parole and was not allowed outside of the Kansas City
metropolitan area. Adams was returned to Kansas City, and appellant and Henderson
continued their car trip to Houston. After April 2, 2006, Adams talked to Rodney
about what occurred in Houston, and Rodney said, "[I]t just didn't go right." 

 Adams, after listening to a tape recording made by the Pasadena Police
Department, conceded that on June 7, 2006, he had previously told police officers that
Henderson had explained to him that the person they were going to intimidate was
being "watched," and, when they actually confronted the person, they were going to
"[j]ust talk to him, put hands on him if need be[,] . . . [and] zip-tie him." Adams also
recalled that they were going to use a rental car for transportation while in Houston. 
On cross-examination, Adams stated that he was on parole for two felony narcotics
convictions and, although he had not been paid, the State offered him $5,000 "for
talking."

 Alicia McGrew, appellant's ex-girlfriend, testified that she had dated and lived
with appellant for approximately six months. Appellant initially told McGrew that
he went to Houston "[t]o retrieve some money" from an escort service that he and
Rodney owned. Appellant subsequently told McGrew that he had reserved a rental
car for use in Houston with his credit card, but then paid cash for it. When asked if
appellant had told her what kind of car he had rented, McGrew responded, "I believe
it was either a Crown Victoria, or something very similar." Appellant and McGrew
also "talked about [appellant] dressing up as a police officer and having full police
uniforms and picking--trying to pick somebody up because of a debt they [sic] owed
his brother to try to get the money back from him or to try to do something to him." 
Appellant explained to McGrew that a "guy borrowed a lot of money" from Rodney. 
McGrew reemphasized that,

[Appellant] told me that he rented a car, that he went to go get the guy
from his place of employment, and that he was dressed up as an officer
and that he arrested the guy at his place of employment. And then when
the guy got in the car, the guy realized that he was not actually being
arrested, because the car had leather seats and no police officer's car
would have leather seats and maybe even a sunroof, but I'm not sure
about that.


On cross-examination, McGrew agreed that she and appellant stopped seeing each
other under less than "amicable circumstances" and that she had been arrested in
relation to the offense, but she explained that the case against her was dismissed. 
McGrew also conceded that she suffered from an anxiety disorder and is bipolar, for
which she takes medications such as Lamictal, Risperdal, and Xanax.

Legal Sufficiency

 In his fourth issue, appellant argues that the evidence is legally insufficient to
support his conviction because a "review of the facts . . . shows that a completed
offense of aggravated kidnapping never occurred." He asserts that the "most the
evidence shows is an attempt to commit the offense of aggravated kidnapping."

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt.
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). In conducting
our legal sufficiency review, we are mindful that the trier of fact is the sole judge of
the weight and credibility of the evidence. Margraves v. State, 34 S.W.3d 912, 919
(Tex. Crim. App. 2000). Thus, when performing our review, we may not reevaluate
the weight and credibility of the evidence and substitute our judgment for that of the
fact-finder. Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must
resolve any inconsistencies in the evidence in favor of the verdict. Curry v. State, 30
S.W.3d 394, 406 (Tex. Crim. App. 2000).

 A person commits the offense of aggravated kidnapping if the person
intentionally or knowingly abducts another person and uses or exhibits a deadly
weapon during the commission of the offense. Tex. Penal Code Ann. § 20.04(b)
(Vernon 2003). "Abduct" includes restraining a person with intent to prevent his
liberation by using or threatening to use deadly force. Id. § 20.01(2) (Vernon 2003). 
"Restrain" means to restrict a person's movements without consent, so as to interfere
substantially with the person's liberty, by moving the person from one place to
another or by confining the person. Id. § 20.01(1) (Vernon 2003). Restraint is
without consent if it is accomplished by force, intimidation, or deception. Id. §
20.01(1)(A). No specific time requirement exists for determining whether a restraint
has taken place. Hines v. State, 75 S.W.3d 444, 447-48 (Tex. Crim. App. 2002).

 Here, viewing the evidence in the light most favorable to the verdict, the
complainant testified that appellant's brother, Rodney, believed that the complainant
owed Rodney $105,000 from a loan to Rodney and the complainant's failed business
venture. Adams testified that on March 31, 2006, he, appellant, and Henderson were
to drive from Kansas City to Houston in order to "intimidate" and "zip-tie" a "guy"
that owed money to appellant's brother. McGrew testified that appellant told her that
he went from Kansas City to Houston to "try to do something" to a person, "at his
place of employment," who owed a debt to his brother, Rodney. Appellant explained
to McGrew that he rented a car, dressed as a police officer, and "arrested" somebody. 
However, appellant added that the person that he attempted to arrest "realized that he
was not actually being arrested." 

 In accord with Adam's and McGrew's testimony and circumstantial evidence,
the complainant, Creason, and Officer Eilers testified that two assailants, dressed as
police officers, actually restrained the complainant and attempted to force the
complainant into a car, while both the complainant and Creason testified that the
assailants were armed with firearms. Also, the complainant and Eilers both testified
that the two assailants handcuffed the complainant with zip-ties. A rational trier of
fact could have found, beyond a reasonable doubt, that appellant intentionally or
knowingly abducted the complainant and exhibited a deadly weapon during the
commission of the offense. See Holmes v. State, 873 S.W.2d 123, 125-26 (Tex.
App.--Fort Worth 1994, no pet.) (concluding that evidence was legally sufficient to
support defendant's aggravated kidnapping conviction when defendant used force to
unsuccessfully make complainant go into complainant's car). Accordingly, we hold
that the evidence is legally sufficient to support the jury's finding that appellant
committed the offense of aggravated kidnapping.

 We overrule appellant's fourth issue.

Henderson's Testimony

 In his second and third issues, appellant argues that the trial court erred in
allowing "the State to call . . . Henderson to the stand" and in refusing to instruct the
jury that it could draw no inference of appellant's guilt from Henderson's silence.
 Before the State called Henderson to testify, Henderson's attorney informed the
trial court that, because Henderson pleaded not guilty at his trial and his case was on
appeal, Henderson would assert his Fifth Amendment privilege against self-incrimination, even if it subjected him to criminal contempt charges. The State
argued that Henderson could not assert the Fifth Amendment privilege because
Henderson waived the privilege by testifying at his trial. The trial court denied
appellant's request that Henderson testify outside the presence of the jury. Appellant
then objected to Henderson's testimony as a violation of his right to confrontation and
added, "You can't knowingly put [Henderson] on in front of [the] jury if he's going
to take [t]he Fifth." The trial court granted Henderson use immunity and stated, "We
all know [Henderson's] going to take [t]he Fifth." Partially in front of and outside the
presence of the jury, the following exchange occurred:

[The State]: And you previously testified in a proceeding in this
court on August 24th, 2007, correct?


[Henderson]: Plead the Fifth.


[The State]: State asks witness be instructed to testify.


[The trial court]: Give me that date again.


[The State]: August 24th, 2007.


[The trial court]: Mr. Henderson, you're instructed to answer the
question. The question was: Did you previously
testify on August 24th, 2007, in this court?


[Henderson]: I plead the [F]ifth; because my case is on appeal,
Your Honor.


[The State]: And the State would ask that the-- 


[Appellant]: Objection. This is improper at this point. This is
clearly prejudicial.


[The trial court]: It's overruled.


[Appellant]: Can we have a running objection to any questions
that elicit the Fifth Amendment?


[The trial court]: You may.


[The State]: And you were previously granted--you were
granted use immunity today and previously shown a
form signed by the Judge of this [c]ourt granting you
use immunity for any testimony that you give here
today, correct?


[Henderson]: Plead the Fifth.


[The State]: The State asks that the witness be instructed to
answer the question.


[The trial court]: You're instructed to answer that question, sir.


[Henderson]: I still plead the Fifth.


[Appellant]: Renew my objection and ask for a mistrial, Judge.


[The trial court]: Denied.


[The State]: And did you testify previously that you had done a
lot of soul-searching and you were ready to honor,
obey[,] and glorify God?


[Appellant]: I'm going to object as to the relevance of that, in the
first place.


[The trial court]: Sustained.


[Henderson]: Plead the Fifth.


[The trial court]: Just a moment. The objection was sustained.


[The State]: Goes to his reason for testifying previously.


[The trial court]: It's overruled. Go ahead.


[The State]: Did you testify in a previous proceeding that
[appellant] asked you to come down to Houston?


[Appellant]: Objection, improper impeachment; and also,
he--it's improper impeachment.


[Trial court]: It's overruled.


[Henderson]: I, once again, plead the [F]ifth.


[The State]: State asks that the defendant--or that the witness be
instructed to answer this question.


[Appellant]: I'd ask for a limiting instruction, once again, renew
our objection, Judge.


[The trial court]: A limiting instruction as to what?


[Appellant]: That his failure to answer these particular questions
can't be viewed in any way, shape[,] or form as
damaging my client in reference to his invoking the
Fifth Amendment, his silence.


[The trial court]: A limiting instruction, at this point, your motion is
denied. You're instructed to answer the last
question, sir.


[Henderson]: I still plead the Fifth, Your Honor.


[The State]: Did you testify in a previous proceeding, on August
24th, 2007, that [appellant] asked you to come down
to Houston and participate in an ordeal to admit [sic]
fear into someone, to either make this guy submit
money back that they had felt he had stolen or go to
a court date or something?


[Appellant]: Objection as to leading the witness, Judge.


[The trial court]: Don't lead your witness, sir.


[Appellant]: Ask for a ruling on this particular question.


[The trial court]: Objection sustained.


[Appellant]: Ask for an instruction for the jury to disregard the
question.


[The trial court]: Disregard the last question by the State, ladies and
gentlemen.


[Appellant]: Once again, ask for a mistrial.


[The trial court]: Denied.


[The State]: And, Judge, at this time the State would ask for
permission to treat this witness as hostile.


[Appellant]: Object, Your Honor. The witness is invoking his
rights. That does not make him hostile. It makes
him basically-- 


[The trial court]: Approach, please. . . . Take the jury out, please.
(Outside jury's hearing)[.] So, basically, the whole
idea is to put all this witness'[s] testimony before the
jury[?]


[Henderson]: I, once again, plead the [F]ifth.


[The State]: We want to ask him about relevant portions of what
he testified to, yes, Judge, for sure.


[The trial court]: So, you'll get to look at a transcript; and he could
say, I'm taking [t]he Fifth. You . . . just pass it to
the jury?


[The State]: At this time we're ordering him to answer the
questions, because he doesn't have a Fifth
Amendment privilege, not now. He's previously
testified to matters that are important in this
proceeding, and certainly relevant, since he has
knowledge of what happened. So, we're asking that
the [c]ourt order him to answer the questions. If he
refuses to answer those questions, then we'd ask the
[c]ourt to hold him in contempt. And we'd also, of
course, ask we be entitled to impeach him regarding
the prior testimony. . . . 


[The trial court]: I have great concern about unfairly prejudicing
[appellant] to go forward. . . . And we are trying
[appellant]. We're not trying [Henderson]. . . .


[The State]: And[,] he doesn't have a right to take the [F]ifth.


[The trial court]: We're not in complete agreement on that. We're not
going to proceed with anymore questions of
[Henderson]. Now, what else do you have? . . .


[The State]: Not that I can think of. . . .


[Appellant]: I would just renew our motion for mistrial based on
the fact the witness stated he had already been
convicted of this offense. . . . (Jury enters
courtroom)[.]


[Appellant]: I object to any further testimony on the part of
[Henderson].


[The trial court]: Objection sustained. He may stand down.


 When a witness has a valid Fifth Amendment privilege, it is generally error for
the State to call a witness when it knows that the witness will assert his or her Fifth
Amendment privilege. Coffey v. State, 796 S.W.2d 175, 177 n.4 (Tex. Crim. App.
1990); Mathis v. State, 469 S.W.2d 796, 801 (Tex. Crim. App. 1971); Washburn v.
State, 164 Tex. Crim. 448, 452, 299 S.W.2d 706, 708 (1957). On the other hand, after
a witness is granted immunity, it is generally permitted for the State to call a witness
to the stand to assert his or her Fifth Amendment privilege, even if the State knows
that the witness will assert his or her Fifth Amendment privilege. Coffey, 796 S.W.2d
at 177. The rationale is that, when a witness is granted immunity for his or her
testimony, the witness does not have a valid basis for refusing to testify. Id. at 179.

 However, the Texas Court of Criminal Appeals has found error when the State
called a convicted codefendant to the stand, knowing that the codefendant would
invoke his Fifth Amendment privilege. Vargas v. State, 442 S.W.2d 686, 687 (Tex.
Crim. App. 1969); see Coffey, 796 S.W.2d at 177 n.4. The State had told the jury that
the codefendant had "already been convicted of the offense" and the court did not
address the fact that the witness did not have a valid Fifth Amendment privilege. 
Vargas, 442 S.W.2d at 687; see Coffey, 796 S.W.2d at 177 n.4. Also, the Texas Court
of Criminal Appeals has explained that even if it is "constitutionally permissible" to
call a witness asserting his or her Fifth Amendment privilege, the State could
"unfairly prejudice[]" a defendant by asking "a series of damaging questions in such
a way as to invite the jury to assume that the answers to each question would have
been in the affirmative." Coffey, 796 S.W.2d at 179 n.6. 

 In Taylor v. State, the defendant was convicted of the offense of murder, and,
at his trial, although circumstantial evidence showed that the defendant murdered the
complainant, the State, knowing that the witness would assert her Fifth Amendment
privilege, asked her if she had told police officers that the defendant had murdered
the complainant. 653 S.W.2d 295, 298-301 (Tex. Crim. App. 1983). The witness
asserted her Fifth Amendment privilege. Id. at 299. The Texas Court of Criminal
Appeals reversed, explaining that, "[o]f course, with the [State's] assertion of the fact
that [the witness] told an investigator [the defendant] 'shot [the complainant],' any
reasonable doubt harbored by a juror was no doubt dispelled." Id. at 301. The court
reasoned that the State "was not entitled to have the witness invoke the Fifth
Amendment repeatedly and, knowing she would do so, seize upon her refusal to
testify as an opportunity to place before the jury parts of her [inadmissible] hearsay
statement." Id. at 303-04. The court also stated, "Neither was it possible to erase this
critical 'evidence' from the jury's collective consciousness by an instruction to
disregard it." Id. at 301. 

 Here, appellant objected to Henderson's testimony and unsuccessfully sought
for Henderson to testify outside of the jury's presence. The State and the trial court
knew that Henderson would assert the Fifth Amendment privilege. Although the trial
court did eventually stop the State's questioning of Henderson because it had "great
concern about unfairly prejudicing" appellant, it did not do so until after Henderson,
known by the jury to be a codefendant, had repeatedly asserted his Fifth Amendment
privilege. While asserting the Fifth Amendment privilege, Henderson explained that
his case was on "appeal," and the State subsequently questioned Henderson as to
whether he had testified in "a previous proceeding" that he had come with appellant
to Houston. As the trial court instructed the jury in its charge on the law of parties,
Henderson's testimony served to establish appellant's guilt because it showed that
Henderson was a convicted codefendant who had come to Houston with appellant to
aid him in the commission of the offense. See Taylor, 653 S.W.2d at 301 (finding
reversible error due to State's calling witness who asserted her Fifth Amendment
privilege because State's questioning of witness's inadmissible statement secured
defendant's conviction); Gearns v. Berghuis, 104 F. App'x 517, 520 (6th Cir. 2004)
(reasoning that Confrontation Clause was violated when State used witness's
assertion of the Fifth Amendment privilege to establish elements of its case). 
Although the trial court did instruct the jury to disregard the State's question to
Henderson about whether appellant came with him to Houston to strike "fear" into
someone in order to get back "stolen" money, such a question dispelled "any
reasonable doubt harbored by a juror" and the trial court's instruction to disregard
could not "erase this critical 'evidence' from the jury's collective consciousness." 
See Taylor, 653 S.W.2d at 301. 

 The State was not entitled to call Henderson, knowing that he would assert his
Fifth Amendment privilege, to "seize upon [his] refusal to testify as an opportunity
to place before the jury" inadmissible evidence. See id. at 303-04. Although the
State's questioning of Henderson was "not technically testimony," it formed "a
crucial link" in the proof against appellant and was the "equivalent . . . of testimony"
because the State's "reliance upon the privilege created a situation in which the jury
might improperly infer both that the statement[s] had been made and that [they] were
true." See Douglas v. Alabama, 380 U.S. 415, 419, 85 S. Ct. 1074, 1077 (1965); see
also Coffey, 796 S.W.2d at 179 n.6 (noting that it was error for State to call witness
and ask damaging questions as witness asserts Fifth Amendment privilege because
jury assumes answers would be in affirmative). Accordingly, we hold that the trial
court erred in allowing the State to question Henderson in the jury's presence and in
admitting Henderson's testimony to the extent that it did.

 In his third issue, appellant argues that the trial court erred in denying his
request for a limiting instruction to the jury that it could draw no inference of
appellant's guilt from Henderson's invocation of his Fifth Amendment privilege
against self-incrimination.

 Texas Rule of Evidence 105(a) provides in part, "When evidence which is
admissible . . . for one purpose but not admissible . . . for another purpose is admitted,
the [trial] court, upon request, shall restrict the evidence to its proper scope and
instruct the jury accordingly . . . ." Tex. R. Evid. 105(a). Texas Rule of Evidence
513(d) provides in part, "[U]pon request[,] any party against whom the jury might
draw an adverse inference from a claim of privilege is entitled to an instruction that
no inference may be drawn therefrom." Tex. R. Evid. 513(d). A defendant has a
right to remain silent when arrested, and the exercise of this right may not be used
against the defendant as a circumstance tending to show guilt. Sanchez v. State, 707
S.W.2d 575, 578 (Tex. Crim. App. 1986).

 It is undisputed that appellant requested a limiting instruction that the jury draw
no inference against him from Henderson's invocation of the Fifth Amendment
privilege against self-incrimination. The State implicated Henderson in the offense,
starting with the opening statement. Moreover, Adams and Ramirez implicated
Henderson as a party to the offense. In fact, because appellant was subsequently
charged as a party to Henderson's offense, "such an inference could also tend to
incriminate appellant, his co-defendant." Torres v. State, 137 S.W.3d 191, 198 (Tex.
App.--Houston [1st Dist.] 2004, no pet.). In other words, "by creating an inference
that [Henderson] was guilty, the State needed only then to prove that appellant
'solicited, encouraged, directed, aided, or attempted to aid'" Henderson. Id.; see also
McKaine v. State, 170 S.W.3d 285, 293 (Tex. App.--Corpus Christi 2005, no pet.)
(reasoning that "witness's assertion of his or her Fifth Amendment rights and refusal
to testify is not evidence and the jury is not allowed to draw any inferences from such
actions"). Accordingly, we hold the trial court erred in denying appellant's request
for a limiting instruction.

 Next, we must determine whether appellant suffered harm. See Tex. R. App.
P. 44.2. We assume, without deciding, that the trial court's errors in allowing
Henderson to repeatedly invoke his Fifth Amendment privilege and in denying
appellant's request for a limiting instruction to the jury that it could draw no adverse
inference of appellant's guilt from Henderson's invocation of his Fifth Amendment
privilege against self-incrimination were nonconstitutional errors subject to a harm
analysis under Texas Rule of Appellate Procedure 44.2(b). See id.

 Rule 44.2(b) requires us to disregard a nonconstitutional error that does not
affect a criminal defendant's substantial rights. See id. We may not reverse a
defendant's conviction for nonconstitutional error if, after examining the record as
a whole, we have fair assurance that the error did not have a substantial and injurious
effect or influence in determining the jury's verdict. Garcia v. State, 126 S.W.3d 921,
927 (Tex. Crim. App. 2004). "A conviction should not be overturned unless, after
examining the record as a whole, a court concludes that an error may have had
'substantial influence' on the outcome of the proceeding." Burnett v. State, 88
S.W.3d 633, 637 (Tex. Crim. App. 2002) (quoting Bank of Nova Scotia v. United
States, 487 U.S. 250, 256, 108 S. Ct. 2369, 2374 (1988)). In other words, if we have
"'a grave doubt' that the result was free from the substantial influence of the error,"
then we must reverse. Id. A "grave doubt" means that, "in the judge's mind, the
matter is so evenly balanced that he feels himself in virtual equipoise as to the
harmlessness of the error." Id. at 637-38. Thus, the Texas Court of Criminal
Appeals has concluded that "'the presence of overwhelming evidence of guilt plays
a determinative role'" in this analysis. Neal v. State, No. AP-75406, 2008 WL
2437667, at *14 (Tex. Crim. App. June 18, 2008) (quoting Motilla v. State, 78
S.W.3d 352, 356 (Tex. Crim. App. 2002)). 

 Setting aside Henderson's testimony, the State's evidence of appellant's
involvement in this case, in summary, consisted of the following: (1) appellant's
brother, Rodney, believed that the $105,000 that he gave to the complainant in a
failed business venture was an unpaid loan, rather than a lost capital contribution, (2)
appellant traveled with Henderson from Kansas City to Houston two days before the
attack and left Houston to return to Kansas City hours after the attack, (3) appellant
rented a car in Houston which resembled the car that the two assailants used in their
attack on the complainant, (4) Henderson rented a hotel room the night before the
attack, (5) Adams, appellant's friend, testified that he, Henderson, and appellant were
going "to intimidate some guy" and "zip-tie" him, and (6) appellant's ex-girlfriend,
McGrew, testified that appellant told her that he went to Houston to rent a car, dress
as a police officer, and "arrest" a guy. 

 No direct evidence linked appellant to the offense nor could anyone identify
appellant or Henderson as one of the assailants. Other than Henderson's testimony,
the State's case was principally based on Adam's and McGrew's testimony. 
Although their testimony certainly linked appellant to the offense, Henderson's
testimony dispelled "any reasonable doubt harbored by a juror" by conclusively
proving the State's case. See Taylor, 653 S.W.2d at 301. The jury charge authorized
appellant's conviction if Henderson committed the offense of aggravated kidnapping
and appellant, "with the intent to promote or assist the commission of the offense, if
any, solicited, encouraged, directed, aided or attempted to aid Derrick Henderson to
commit the offense." Not only did Henderson's assertion of the Fifth Amendment
privilege against self-incrimination leave the jury with the indelible impression that
Henderson had already been convicted of the offense, as he stated that his case was
on "appeal," the State's questioning of Henderson also left the jury with the indelible
impression that appellant directly participated with Henderson in committing the
offense by accompanying Henderson on a trip to Houston. This indelible impression
was only compounded when the trial court refused to grant appellant's limiting
instruction that Henderson's assertion of the Fifth Amendment privilege against self-incrimination could not be used against him. See Torres, 137 S.W.3d at 198. 

 We cannot conclude with "fair assurance," as the rule of law requires, that the
trial court's errors in allowing Henderson to repeatedly invoke his Fifth Amendment
privilege and in denying appellant's request for a limiting instruction to the jury that
it could draw no adverse inference of appellant's guilt from Henderson's invocation
of his Fifth Amendment privilege against self-incrimination "did not influence the
jury, or had but a slight effect" on the jury's determination on whether appellant
committed the offense of aggravated kidnapping. See Reese v. State, 33 S.W.3d 238,
243 (Tex. Crim. App. 2000). We hold that the errors affected appellant's substantial
rights. See Tex. R. App. P. 44.2(b).

 We sustain appellant's second and third issues. (9)

Conclusion

 We reverse the judgment of the trial court and remand the cause for
proceedings consistent with this opinion.


 

 

 Terry Jennings

 Justice


Panel consists of Justices Taft, Jennings, and Bland.


Do not publish. Tex. R. App. P. 47.2(b). 
1. See Tex. Penal Code Ann. § 20.04(b) (Vernon 2003).
2. See U.S. Const. amend. V.
3. See U.S. Const. amend. VI.
4. Jason McCoin, a manager for Hertz, testified that Hertz's business records showed
that, on April 1, 2006 at approximately 10:04 a.m., appellant rented a white, Mercury
Grand Marquis, which was returned on April 2, 2006 at approximately 4:29 p.m. The
business record also showed that the Mercury Grand Marquis's license plate number
was "260LHN." 
5. Eyennidth Ramirez, a front desk clerk at the Leisure Inn in Houston, testified that on
April 1, 2006, a business record showed that "Derrick Henderson" stayed overnight
at the Leisure Inn. Ramirez also identified Henderson when police officers showed
her a photographic array. Ramirez remembered that, when Henderson checked out
the next day, he was "worried."
6. Houston Police Department Sergeant B. McDaniel testified that, in urban areas, a
cellular telephone caller is usually within two miles of the cellular telephone tower
that initially processes a telephone call. Appellant's cellular telephone records also
showed that, after the rental car under appellant's name was returned to Hertz at
approximately 4:20 p.m. on April 2, 2006, appellant quickly made his way back to
Kansas City.
7. Detective Villareal did testify that police officers found a black shirt with the word
"HOMICIDE," "BDUs," i.e., "utility pants," and zip-ties, which did not match any
of the zip-ties recovered at the scene of the offense.
8. Adams did not know the name of appellant's "brother."
9. Having sustained appellant's second and third issues, we need not address his first
issue, in which he asserts that the trial court erred in admitting Henderson's testimony
in violation of appellant's Sixth Amendment right to confrontation; his fifth issue, in
which he asserts that the evidence is factually insufficient to support his conviction;
and his sixth issue, in which he asserts that the trial court erred in determining his
punishment absent a valid waiver of his right to have the jury determine his
punishment. See Tex. R. App. P. 47.1.